UNITED STATES of America,
Plaintiff–Appellee,

v.

**William LEWIS, Defendant–Appellant.**

No. 02–1241.

United States Court of Appeals,
Sixth Circuit.

July 16, 2003.

Before: KEITH, MOORE, and GIBBONS, Circuit Judges.

## OPINION

GIBBONS, Circuit Judge.

A federal jury convicted defendant-appellant William Lewis of one count of being a felon in possession of a firearm and one count of possession of an unregistered short-barreled rifle. Lewis appeals his conviction on the ground that the evidence presented at trial was insufficient to establish beyond a reasonable doubt that he possessed the firearm at issue. Lewis also appeals his conviction on the ground that the prosecutor committed misconduct during the government's closing argument. For the reasons set forth below, we affirm Lewis's conviction.

### I.

Shortly before 5:00 a.m. on December 13, 2000, Lawrence Turner, accompanied by Lisa Frazier, stopped at a gas station at the intersection of Schoolcraft and Greenfield in Detroit, Michigan, to purchase gum, donuts, and soda. Frazier remained inside the car while Turner went inside. As Turner was paying for these items and

talking to the cashier, Lewis approached him from behind, stuck a gun in the middle of his back, and demanded that he give Lewis his money.[1] Turner responded that he did not have any money. Lewis then moved the gun from the center of Turner's back to the back of Turner's head and repeated his demand. When Lewis moved the gun to the right, directly beside Turner's head, Turner grabbed the gun and struggled with Lewis for four to five minutes. Turner shook the gun loose from Lewis, and it fell to the floor. Lewis ran out of the building, and Turner picked up the gun and pursued him.

As he entered the parking lot, Turner saw Frazier grab Lewis and hold him as he ran by. Frazier had noticed that it was taking Turner a little longer than usual, left the car, and saw Turner fighting with Lewis. At trial, Frazier described her interaction with Lewis:

Q. When he was coming towards you, what did you decide to do?

A. Wrap him up.

Q. Why did you do that?

A. He was running towards the car and I didn't know what he was going in that direction for.

Q. Could you tell the Jury please what sort of car you saw the Defendant run towards?

A. I believe it looked like a late model Grand Am, sort of a smokey [sic] gray.

Q. Were there a lot of cars there in the parking lot that morning?

A. No, there weren't.

Q. Were there a lot of people that morning?

A. No. there weren't.

Upon seeing Frazier with Lewis. Turner hit Lewis on the back of the head with the barrel of the gun. At trial, Turner described the struggle that ensued:

Q. And was there a car in the parking lot besides yours?

A. Yes it was.

Q. Could you describe that car?

A. An old model Grand Am. I think it was a two-door Grand Am.

Q. How did you notice that car? How was your attention drawn?

A. You—well, he ran towards the car and I chased him towards the car.

Q. What happened when you got near the car?

A. We struggled a little more. I was trying to stop the gentleman from getting in the car, so he tried to grab the door knob and I think I hit his hand with the gun.

Frazier confirmed Turner's observations, adding that Lewis "was backing up towards that way, in the direction of the car" and that Lewis "was reaching for the door."

At this time, Turner noticed another gun in the middle of the front seat of the Grand Am, near the console. Turner identified the gun found in the car at trial. Turner believed that Lewis was attempting to get inside the car and shoot him. Turner and Lewis continued to struggle, and they both fell. Turner hit Lewis three times with the gun used in the robbery. Turner then demanded that Lewis get away from the car, and Lewis "stumbled away."

That morning, Andre Kirkland, an officer with the Detroit Police Department, was doing routine patrol with his partner, officer William DiCicco. As they were

---

1. The weapon used by Lewis in the robbery was a Smith and Wesson .44 caliber break top antique revolver, which was not charged in the indictment.

driving north on Greenfield toward Schoolcraft, they saw some people waving them down at a gas station. Kirkland went to the gas station, where Turner approached him and stated that Lewis had attempted to rob him. Turner related the incident to Kirkland and described Lewis as a "black male, possibly 29–30" who was "bleeding from the struggle." Kirkland and DiCicco drove around the area and found Lewis. who matched the description Turner provided. Kirkland took Lewis to the gas station, where Turner and Frazier identified him.

Jermari Price, also an officer with the Detroit Police Department, responded to the scene around 5:15 a.m. Price spoke with Turner, who told him that Lewis "was heading towards a Grand Am that was parked over by the gas pumps." Price noticed that the Grand Am was the only car parked by the gas pumps, and also "observed some blood leading towards the car." At trial, Price described the scene:

Q. How would you describe the blood that you saw?

A. Drops that were headed towards that vehicle.

Q. Headed towards the vehicle?

A. Yes.

Q. Well, what made you think that the drops headed towards the vehicle?

A. There was a trail going towards the car.

Q. From where to where?

A. From the front of the gas station all the way to the car.

Q. From the front of the gas station, all the way-and how long a trail would that have been?

A. Ten yards maybe.

Price "looked inside the car and observed the handgun that was in the seat, actually on the center console," and he took possession of the firearm. Price also impounded the car because Turner "told us that's the car that the Defendant was going trying to get into." Price noted that keys were in the ignition.

Julius Moses, an investigator with the Detroit Police Department, was assigned to investigate street robberies. Moses had a discussion with Lewis on December 14 in which Lewis admitted that he attempted to rob Turner with an unloaded handgun. Moses "did not discuss the automobile that [Lewis] had been using," nor did he dust car for fingerprints.

A few days later, Jerome Sharpe, a special agent with the Bureau of Alcohol, Tobacco, and Firearms (ATF) was notified by the Detroit Police Department Robbery Task Force about possible federal firearm offenses related to the December 13 incident. At trial, Sharpe identified the gun found in the car as a "Stevens Crackshot 26.22 caliber lever action single shot rifle that has had both the barrel and the stock sawed down." Sharpe stated that federal firearms laws require the barrel length of a rifle to be at least sixteen inches, with an overall length of at least twenty-six inches. According to Sharpe, the firearm in question had a barrel length of slightly less than five inches, with an overall length of slightly less than ten inches. Sharpe explained that it is illegal to own a short-barreled firearm unless it is registered with the federal government.

At trial, Sharpe was asked whether firearms are commonly fingerprinted, to which he responded:

It depends on the circumstances. I'd have to say yes and no. In this particular case, by the time I was involved in it, the weapon had already been handled by numerous people the officers at the scene, officers in the Property Section that had not been protected for prints. So in this case in particular it would

have been rather pointless. In instances where weapons are-say a homicide scene where a weapon is printed, we find that generally speaking, unlike on television in about three percent of cases do we actually get usable latent prints off a weapon.

Sharpe also stated that there was no scientific evidence connecting Lewis to the firearm. During his investigation, Sharpe learned that the car was not titled or registered to Lewis. The parties stipulated that Lewis had a prior felony conviction and that the firearm traveled in interstate commerce.

On March 14, 2001, Lewis was indicted in the United States District Court for the Eastern District of Michigan on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and one count of possession of an unregistered short barrel rifle, in violation of 26 U.S.C. § 5861(d). Trial commenced on August 21, 2001, and on August 23, 2001, the jury returned a verdict of guilty on both counts. On February 7, 2002, Lewis was sentenced to 112 months in prison and three years of supervised release. Lewis filed his notice of appeal on February 15, 2002.

## II.

■ Lewis asserts that the government presented insufficient evidence to sustain his convictions under 18 U.S.C. § 922(g) and 26 U.S.C. § 5861(d). However, Lewis failed to make a motion for judgment of acquittal under Rule 29 of the Federal Rules of Civil Procedure. Absent a manifest miscarriage of justice, Lewis's failure to make a motion for judgment of acquittal is a waiver of the right to challenge the sufficiency of the evidence on appeal. *See United States v. Morrow,* 977 F.2d 222, 230 (6th Cir.1992). "A miscarriage of justice exists only if the record is devoid of evidence pointing to guilt." *United States*

*v. Price,* 134 F.3d 340, 350 (6th Cir.1998) (quotation omitted). Since no manifest miscarriage of justice occurred here, Lewis's claim is barred.

■ Moreover, even if the court were to consider Lewis's challenge to the sufficiency of the evidence, the government introduced sufficient evidence from which the jury reasonably could infer that Lewis was guilty of being a felon in possession of a firearm and of possession of an unregistered short barrel rifle. When reviewing a challenge to the sufficiency of the evidence, this court must not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Davis,* 177 F.3d 552, 558 (6th Cir.1999). Instead, this court must "determine merely whether, after reviewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, a rational trier of fact could find the elements of the crime beyond a reasonable doubt." *Id.* "A defendant claiming 'insufficiency of the evidence bears a very heavy burden.'" *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.1986) (quoting *United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983)). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *Id.* (citing *United States v. Stone,* 748 F.2d 361, 363 (6th Cir.1984)).

Twenty-six U.S.C. § 5861(d) makes it unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record," while 18 U.S.C. § 922(g)(1) makes it unlawful for a felon "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition."

To convict under § 922(g)(1), the government must prove that 1) the defendant had a previous felony conviction; 2) the defendant possessed a firearm: and 3) that the firearm traveled in or affected interstate commerce. *United States v. Layne,* 192 F.3d 556, 571–72 (6th Cir.1999). While Lewis does not challenge that he was a felon at the time of his arrest or that the firearm identified by the government traveled in interstate commerce, Lewis argues that the government failed to adduce sufficient evidence that he possessed the firearm at issue to support a conviction under either count of the indictment.

The government may prove possession of a firearm by establishing either actual or constructive possession. "Actual possession occurs when a party has immediate possession or control over a tangible object." *United States v. Holmes,* 9 F.3d 110, 1993 WL 441781, at *2 (6th Cir.1993). Constructive possession exists " 'when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.' " *Layne,* 192 F.3d at 572 (quoting *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.1973)). The government can show a defendant's control over a firearm "by showing that he has dominion over the premises in which the firearms are located." *Id.* Here, the firearm at issue was found in the front seat of a car at the gas station. This court has held that constructive possession of a motor vehicle is established if a person "although not in actual possession, knowingly has both the power and the intention to exercise dominion and control." *United States v. Harrison,* 198 F.3d 247, 1999 WL 1111520, at *3 (6th Cir.1999) (unpublished) (quoting *United States v. Wolfenbarger,* 426 F.2d 992, 994–95 (6th Cir.1970)). Consequently, to prove that Lewis had possession of the firearm at issue, the government had to establish either actual or constructive possession of the vehicle in which the firearm was found.

The car in which the firearm was found was not titled or registered to Lewis, nor was it dusted for fingerprints. However, actual or constructive possession may be proven by circumstantial evidence. *United States v. Reed,* 141 F.3d 644, 651 (6th Cir.1998). Here, circumstantial evidence presented at trial suggested that prior to the attempted robbery Lewis had possession of. the car in which the firearm was eventually found, thereby supporting the jury's decision to convict Lewis on both counts. Turner testified that Lewis "ran towards the car" and "tried to grab the door knob." Frazier also testified that Lewis was "running towards the car" and that he was "reaching for the door." Price testified that he saw "some blood leading towards the car," which was the only vehicle by the gas pumps. Price also noted that the keys were in the ignition of the car. For the car to have been at the gas station, someone necessarily brought it there, and the circumstantial evidence supports a finding that it was Lewis who did so. It was reasonable for the jury to conclude that Lewis would attempt to flee the scene in the same car in which he arrived. Despite a lack of ownership and a lack of direct evidence demonstrating possession of the vehicle, the circumstantial evidence offered thus entitled the jury to conclude that Lewis had actual possession of the vehicle prior to the attempted robbery and that he ran toward the vehicle and grabbed the door with the intent to flee the scene or to obtain the firearm inside.

Lewis argues that the presence of the vehicle does not give rise to a rational inference that he drove it there or that he was a driver or passenger in the vehicle at

any time. Lewis contends that in the instant case, unlike in *Harrison,* the government presented no evidence connecting him to the vehicle. In *Harrison,* the court found that the government had established constructive possession of a stolen motor vehicle even though the motor vehicle "was not in the actual possession of defendant Harrison when it was found, nor was there any testimony at trial indicating that anyone witnessed Harrison in actual possession" of the motor vehicle. *Id.* at *3. The court sustained defendant's conviction, noting that "paperwork found in the vehicle indicates that Harrison was in the process of trying to 'legitimize' or 'legalize' his possession of the truck through false registration and insurance papers" and that "documents found in the truck ... clearly indicate both the name and address of defendant Harrison." *Id.* at *4.

Lewis correctly notes the lack of any direct evidence that he had possession of the car in which the firearm was found. However, Lewis's conviction may be sustained upon "circumstantial evidence alone." *Vannerson,* 786 F.2d at 225. As previously discussed, several witnesses testified that Lewis ran towards the only vehicle by the gas pumps and grabbed the door. Although Lewis argues that "he might simply have been attempting to seek refuge from the assault that he was being subjected to," the government need not remove every reasonable hypothesis except that of guilt. *Id.* The testimony of Turner, Frazier, and Price adequately supported the jury's decision to convict Lewis of both counts of the indictment, and at a minimum established that the record was not "devoid of evidence pointing to guilt." *Price,* 134 F.3d at 350.

### III.

■ Lewis contends that during the closing argument the prosecutor engaged in misconduct that denied him a fair trial. However, Lewis concedes that "defense counsel did not object to this closing argument." In the absence of a timely and proper objection, Lewis's claim will be reviewed only to the extent that it constitutes plain error. *United States v. Causey,* 834 F.2d 1277, 1281 (6th Cir.1987). This court has stated that "the plain error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *Morrow,* 977 F.2d at 226 (6th Cir.1992) (quoting *United States v. Young,* 470 U.S. at 15, 105 S.Ct. 1038 (1985)).

In evaluating allegations of prosecutorial misconduct, this court first examines whether the prosecutor's statements were improper. *United States v. Cobleigh,* 75 F.3d 242, 247 (6th Cir.1996) (citing *United States v. Carroll,* 26 F.3d 1380, 1384–90 (6th Cir.1994)). If the statements were improper, this court then determines whether the impropriety was flagrant. This court considers four factors: 1) whether the remarks tended to mislead the jury or to prejudice the accused; 2) whether they were isolated or extensive; 3) whether they were deliberately placed before the jury; and 4) the strength of the evidence against the accused. *Id.* (citing *Carroll,* 26 F.3d at 1385). If the comment is found not to be flagrant, reversal is appropriate only "when (1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district court failed to give a curative instruction." *Id.* (quoting *United States v. Brown,* 66 F.3d 124, 127 (6th Cir.1995)).

Lewis first argues that the prosecutor "misrepresented trial testimony" with regard to Lewis's relationship to the vehicle in which the firearm was found. Specifically, Lewis points to the following state-

ments by the prosecutor during the closing argument:

> One gun has already been taken from him and he knows he's headed towards his car which has keys in the ignition and he can get out of there fast and he's got a second gun in there.
>
> \* \* \* \* \* \*
>
> This man was headed towards the car, which had the keys in it, had another gun in it and Mr. Turner saw that second gun.
>
> \* \* \* \* \* \*
>
> That was his car, and the same way that he knew those keys were in the ignition so he could get out of there, he knew he had that other gun right on the front seat.
>
> \* \* \* \* \* \*
>
> He was heading towards that car because that's how he arrived there that night. He wanted to get out of there. He knew that the keys were in the car and the gun was on the front seat of the car. It would have been impossible for him to have been operating that car and not have seen the gun right there on the front seat. In the same way that he knew keys were in the ignition that he could get out of there, he knew the gun was in the front seat.
>
> \* \* \* \* \* \*
>
> It's the same thing with the Defendant and this gun that night. He left this gun in the car which is why he was headed back to the car to get this gun and/or to get out of there, the keys again being in the ignition. Just because he didn't have it in his hands doesn't mean that it wasn't his gun. He had left it in the car.
>
> \* \* \* \* \* \*
>
> Did he possess that gun? Ask yourself why he was headed back towards that

car. No other customers there. The keys were in the ignition and the gun was on the front seat. He knows the gun was on the front seat because he put it on the front seat and he knows the keys were in the ignition because he put them there. He drove that car that night. He went there to rob that gas station.

As discussed in the previous section, however, there was sufficient evidence for the jury to conclude that Lewis had possession of the vehicle and the firearm at issue. The prosecutor merely asked the jury to draw appropriate inferences from the testimony of Turner, Frazier, and Price. Moreover, the prosecutor himself added, "We don't have anyone who saw him in the car. That's part of the point. When you're committing an armed robbery you want to be surreptitious." The prosecutor's statements were not improper, but rather were reasonable characterizations of the evidence and reasonable inferences that could be drawn from the evidence.

■ Lewis next argues that the prosecutor "vouch[ed] for the credibility of the police witnesses and her star witness Mr. Turner" and that the prosecutor "suggested that she, as representative of the government, had superior knowledge of the truth and veracity of the witness." "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir.1999) (citing *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir.1992)) (stating that improper vouching occurred when prosecutor asserted own belief in witness's credibility through comments including "I think he [the witness] was candid. I think he is honest.") Improper vouching also includes

"comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *Id.*

In this case, the prosecutor stated, with regard to Turner and Price's credibility:

It's highly doubtful that Mr. Turner since that night of the attempted armed robbery has sat in his living room for five minutes looking at a clock trying to pace himself through the fight with the Defendant. But when he was asked to do that in court, he did it and *he gave what I'm going to submit is a very credible account of what happened.*

> \* \* \* \* \* \*

*There's no reason for Mr. Turner to come in here and make up this whole situation.* Why on earth would he? He has no reason to come in here and tell you about an armed robbery attempt that happened if it didn't happen. He has no reason to tell you about a struggle by the car if it didn't happen. He already got the first gun away from the defendant. There's no reason for him to come in and tell you that the Defendant was trying to get to that other car, the Grand Am unless that's what was happening.

Officer Price told you that the gun was found in the car. *He has no reason to come in here and tell you that.*

(emphasis added). This court previously has stated that "[t]he use of the words 'I submit' are not the equivalent of expressing a personal opinion." *United States v. Stulga,* 584 F.2d 142, 147 (6th Cir.1978). However, this court also has stated that a prosecutor's use of the phrase "I submit" or "I suggest," combined with a statement that a witness "had no reason to lie," can be "reasonably construed to be based on personal belief." *United States v. Krebs,* 788 F.2d 1166, 1177 (6th Cir.1986) (quoting *United States v. Bess,* 593 F.2d 749, 756 (6th Cir.1979)). The foregoing passages reflect that similar remarks were made by the prosecutor in this case.

In order to constitute reversible error, however, the statements must also be flagrant – that is, they must tend to mislead the jury or to prejudice the accused. *Carroll,* 26 F.3d at 1385. Here, the jury was instructed that "[t]he lawyer's statements and arguments are not evidence." Moreover, for an error to have been prejudicial under the plain error standard, the defendant must show that "[i]t must have affected the outcome of the district court proceedings." *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Lewis has failed to establish prejudice. Since the prosecutor's statements thus were not flagrant, and no contemporaneous objection was made, reversal is not appropriate. *See Cobleigh,* 75 F.3d at 247. The prosecutor's words did not violate Lewis's right to a fair trial.

## IV.

For the foregoing reasons, we affirm the decision of the district court.

MOORE, Circuit Judge, concurring.

I concur. With respect to Part III of the majority's opinion, I would, however, assume that the prosecutor's statements in closing argument were improper, and rest my conclusion simply on the ground that plain error has not been shown. For that reason, and on the basis of the reasoning of Parts I and II of the majority. I join in affirming Lewis's conviction.