NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0612n.06
Filed: July 20, 2005

Nos. 03-4129, 03-4130

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| EDWARD RUDOLPH LEGETTE-BEY, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |

BEFORE:     COLE and SUTTON, Circuit Judges; and BARZILAY, Judge.[*]

**R. GUY COLE, JR., Circuit Judge.**  Edward Rudolph Legette-Bey was convicted of six bank robberies and related firearms charges.  Two co-conspirators, Jerry Swims and Eric Garrett, testified that Legette-Bey was involved in all six of the robberies; Legette-Bey denies any involvement.  Legette-Bey claims that the prosecutor made improper statements during her closing argument, expressing her personal belief in Swims' and Garrett's credibility.  Because the statements in the instant case were not so flagrant as to constitute a fundamental miscarriage of justice, because we find that the time needed to prepare pre-trial sentencing reports requested by Legette-Bey is "excludable" time for Speedy Trial Act purposes, and because Legette-Bey's other arguments lack merit, we **AFFIRM** his conviction and sentence.

**I.**

_____

[*]The Honorable Judith M. Barzilay, Judge of the United States Court of International Trade, sitting by designation.

**A. The May 21, 2002 Robbery of First Federal Bank of Lakewood, Fairview Park Branch**

On May 21, 2002, three masked and gloved men robbed the First Federal Bank of Lakewood's branch location in Fairview Park, Ohio. Two of the robbers hurdled the counter and began taking money from teller drawers, while the third man held the bank manager at gunpoint. One robber then asked the bank manager to open the vault. Because the robbers were "covered from head to toe," none of the bank tellers were able to give an accurate description of the robbers.

After taking $64,913 from the teller drawers and the vault, the robbers left in what was described by several tellers as a metallic Ford Contour with no license plate and a temporary tag in the back window. An off-duty auxiliary police officer spotted the car and, having heard its description over the police radio, began to follow it. Eventually, multiple police cars pursued the suspects' vehicle at a high rate of speed until the vehicle crashed into a house. The suspects exited their vehicle and fled in different directions. After a brief search of the neighborhood, officers found Legette-Bey in a garage, hiding beneath a table on a couch. Legette-Bey fit the general description of the men who had fled from the car crash. When asked by police to explain his presence in the garage, Legette-Bey replied that he was homeless and was just sleeping there. The officers arrested Legette-Bey as a suspect in the bank robbery, though the shoes he was wearing at the time of his arrest were later found not to match the shoes that any of the robbers were wearing in the bank's security videos.

Meanwhile, two other men who matched the description of the suspects were arrested by other officers in the area. A search of the suspects' vehicle revealed the following items: a loaded revolver, an Ohio temporary license tag, several latex gloves, three Cleveland Indians baseball caps,

three hooded sweatshirts, a coat whose pockets contained a pair of glasses, a cell phone, a pager, and a wallet. The wallet contained, among other items, Legette-Bey's driver's license. In addition, there was a bag of dimes, a bag of quarters, and a bucket containing large amounts of dye-stained, traceable cash in the back seat of the car.

A search of the car's registration showed that it belonged to April Zellner, a long-time friend of Legette-Bey's. Zellner later testified that Legette-Bey had offered to wash her car while she was at work, Legette-Bey having previously borrowed the car on a number of occasions. Legette-Bey was supposed to return the car by 3:00 p.m., but when he did not do so by 5:00, she called the police and was informed that the car had been used in the First Federal Bank robbery.

Eric Garrett, one of the other two men arrested that day, confessed to his role in the robbery, and identified his co-robbers as Legette-Bey and Jerry Swims, who was the third man arrested. Garrett said that the three men lived together, identified himself, Legette-Bey and Swims in various bank surveillance photos, and claimed that Legette-Bey planned the robbery. Further, Garrett stated that he had helped Swims and Legette-Bey plan and execute at least one other bank robbery, that of Charter One Bank, on July 24, 2001. Garrett later pleaded guilty to the May 21, 2002 robbery of the First Federal Bank of Lakewood, and to receipt of proceeds from the Charter One bank robbery.

**B. The July 24, 2001 Robbery of Charter One Bank, Fairview Park Branch**

Garrett testified that on July 23, 2001, he, Swims, and Legette-Bey drove around the west side of Cleveland looking for banks to rob. They selected a bank, but abandoned the plan after a police car drove into the bank's parking lot. The next day, July 24, Swims and Legette-Bey went

back to the bank without Garrett. Garrett testified that Swims and Legette-Bey returned with dye-stained money, which they asked Garrett to help clean. Garrett did so, and received $500-700 for his efforts.

Tellers at the Charter One Bank branch in Fairview Park, Ohio, testified that on that day, two men wearing black nylon masks entered the bank and pointed guns at tellers and customers. One of the two robbers then jumped over the counter and began taking money from the teller drawers. The robber also demanded that the head teller open the vault, from which he took additional money. The robber then jumped back over the counter and fled with his accomplice. The robbers took $18,669, but none of the tellers could give a detailed description of the two men. However, a customer of the bank had noticed two black men acting "suspicious" in a blue Mercury Sable in the parking lot prior to the robbery, and had memorized the license plate of the vehicle. The license plate was found to have been stolen from another car, but following the defendants' arrest in 2002 for the First Federal robbery, a receipt for the purchase of a blue Mercury Sable was found in the residence shared by all three defendants. The name of the purchaser on the receipt was Jehvon Niles.

After his arrest following the robbery of the First Federal Bank of Lakewood, Swims claimed his name was Jehvon Niles, that he was from North Carolina, and that he met Garrett and Legette-Bey while smoking crack earlier that week. Shortly thereafter, Swims and Legette-Bey were indicted by a grand jury for their participation in the robberies of the First Federal and Charter One banks. Swims subsequently entered into a plea agreement, admitting not only that he and Legette-

Bey had committed the two robberies, but also that the two of them had committed at least four previous robberies.

**C. Prior Bank Robberies**

Pursuant to the plea agreement, Swims provided details of the four prior bank robberies. These robberies were the September 13, 1999 robbery of First Federal of Lakewood (Westlake branch); the December 19, 2000 robbery of First Federal of Lakewood (Fairview Park branch); the December 14, 2001 robbery of Third Federal Savings and Loan (South Euclid branch); and the June 1, 2000 robbery of Huntington National Bank (Lakewood branch). In all four robberies, two heavily disguised men had entered the bank. One would point a gun at the customers and tellers in the lobby while the other vaulted over the counter and told the tellers to unlock their cash drawers. Swims stated that he was always the man in the lobby with the gun, and that the gun used was one given to him by Legette-Bey before each robbery. The man behind the counter, whom Swims identified as Legette-Bey, would take as much money as he could within a minute or two, and the two men would then flee via a vehicle parked outside. Clothes matching those worn by the robbers in at least one of these robberies were found in the defendants' apartment. Further, a Ford F-150 pickup truck matching the description of one owned by Legette-Bey was used as the getaway vehicle in another of the four robberies, and a blue Mercury Sable owned by Swims, under the alias Jehvon Niles, was used in a third. Due to the disguises, no teller or customer was able to give a detailed description of the robbers or identify the defendants as the robbers.

**D. Trial**

Pursuant to his plea agreement, Garrett was sentenced to approximately ten-and-a-half years' imprisonment. Swims also entered into a plea agreement and was sentenced to approximately fifteen years' imprisonment. Legette-Bey proceeded to trial on six counts of armed bank robbery and related firearm charges. Both Swims and Garrett testified at Legette-Bey's trial, and both identified Legette-Bey as a robber in all six bank robberies. After the district judge denied Legette-Bey's motion for acquittal, the jury found him guilty of all charges. Legette-Bey was sentenced to approximately 154 years' imprisonment. Legette-Bey timely appealed both his conviction and his sentence.

## II.

### A. Prosecutorial Misconduct

*1. Standard of Review*

Legette-Bey claims that the prosecuting attorney improperly vouched for the testimony of various witnesses during her closing argument. Legette-Bey cites five statements that he claims constituted improper vouching. Ordinarily, this Court reviews *de novo* claims that a prosecutor improperly vouched for a witness's veracity. *United States v. Emuegbunam*, 268 F.3d 377, 403-04 (6th Cir. 2001). However, because Legette-Bey's attorney never objected to the statements at trial, our review is for plain error. *See United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996). To establish plain error on a claim for prosecutorial misconduct, the defendant must show that the comments made by the prosecutor were: (1) improper; and (2) so flagrant that when viewed in context, they would "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *United States v. Young*, 470 U.S. 1, 16 (1985); *United States v. Beverly*, 369 F.3d 516,

543 (6th Cir. 2004). In considering whether the prosecutor's statements were flagrant, thereby rendering the trial fundamentally unfair, this Court evaluates four factors: "1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; 2) whether the conduct or remarks were isolated or extensive; 3) whether the remarks were deliberately or accidentally made; and 4) whether the evidence against the defendant was strong." *United States v. Modena*, 302 F.3d 626, 635 (6th Cir. 2002) (citing *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)); *see also United States v. Monus*, 128 F.3d 376, 394 (6th Cir. 1997).

*2. Analysis*

a. Were the Statements Improper?

Examining first whether the prosecutor's conduct was improper, we have held that "[i]mproper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness. Improper vouching involves either blunt comments or comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *United States v. Trujillo*, 376 F.3d 593, 607-08 (6th Cir. 2004) (citations omitted). However, neither rhetorical questions nor florid arguments that do not effectively place the imprimatur of the United States Attorney upon the testimony at issue constitute improper vouching. *United States v. Green*, 305 F.3d 422, 430 (6th Cir. 2002). Nor are descriptions of the requirements of a defendant's plea agreement, or other recapitulations of both the evidence previously presented and what the prosecutor hoped to prove via such evidence. *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). Rather, "[t]he threshold determination should be whether counsel's comments can be

reasonably construed to be based on personal belief." *United States v. Hart*, 640 F.2d 856, 859 (6th

Cir. 1981); *see also United States v. Bess*, 593 F.2d 749, 754 (6th Cir. 1979) ("[T]he personal

opinion of counsel has no place at trial."); MODEL RULES OF PROF'L CONDUCT R. 3.4(e) (2003);

ABA STANDARDS FOR CRIMINAL JUSTICE No. 5.8 ("It is unprofessional conduct for the prosecutor

to express his personal belief or opinion as to the truth or falsity of any testimony or evidence . . .

."). If any statements are determined to be improper, we must consider them in the context of the

entire trial. *See Francis*, 170 F.3d at 552-53 (requiring examination of the combination of all

improper statements in light of the entire trial).

As for the first statement, after addressing the evidence that corroborated Garrett's testimony,

the prosecutor stated:

> [W]hen you are considering the evidence, consider the evidence of May 21st. [sic] You don't need Eric [Garrett] and Jerry [Swims]. You don't need to think about those criminals and the baggage they might have to decide what happened on May 21st, 2001.[sic] But when you consider the situation Eric Garrett was in, and what he told Special Agent Rhoads, then you know that his information was reliable. He knew a dye pack had gone off because he helped clean the money. He implicated himself in taking the money, and he said that he had personal knowledge that Jerry Swims and Edward Legette-Bey had, in fact, committed that offense.

J.A. 921-22. Legette-Bey complains that the statement "you know that his information was reliable"

constituted improper vouching. However, this statement, in context, would not "plac[e] the prestige

of the office of the United States Attorney behind that witness." *Trujillo*, 376 F.3d at 607. Rather,

the prosecutor was merely recapitulating the evidence that corroborated Garrett's testimony, and

explaining that such evidence would back up the statements Garrett made. *See, e.g.*, *United States*

*v. Collins*, 78 F.3d 1021, 1039-40 (6th Cir. 1996) (allowing commentary on reasonable inferences

that can be deduced from evidence adduced at trial); *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994). The prosecutor merely set forth reasons why a juror could find the witness credible in light of specific evidence, an argument that is surely permissible where the two witnesses' credibility is central to the case. Accordingly, this statement does not constitute improper vouching.

Legette-Bey next complains about the prosecutor's statements regarding the truthfulness of Swims' testimony. Swims, of course, admitted that his initial statement to the police was false, but testified at trial that his testimony was truthful as required by his plea agreement. During the closing argument, the prosecutor stated:

> Jerry Swims lied to the Fairview police on May the 21st, 2002. And when he stood on that witness stand and told you about lying, I think everyone here agreed, okay, he did lie to the Fairview police. And when he was asked those questions, "didn't you tell Patrolmen Shepard this or that," and he said "I don't remember," and sometimes he said "Well, I think that policeman might have been putting words in my mouth," and his bottom line to that was, "I don't remember saying that, so if he wrote that down and I don't remember saying it, maybe he did put those words in my mouth."

> But I don't think there was anyone in the courtroom that day that didn't believe that he had told Officer Shepard those very things, the things Shepard had written down in his report and the things that Jerry Swims was asked.

> And I also don't think there's anyone in the courtroom who didn't realize that it would be hard to remember all the lies that you told to Paul Shepard on that first day. Every single thing he said was a lie. And it wasn't – and he had no way of recalling the lies that he had told. And as you heard, some of them he did, and some of them he didn't. But I think we are all assured that when Officer Shepard got on the stand, that those were, in fact, the lies that Jerry Swims had told Paul Shepard.

Despite the government's contention that Officer Shepard's testimony corroborated Swims's testimony that Swims had lied to Shepard upon his original arrest, there can be little question that the prosecutor's statements went further than merely recapitulating the evidence and arguing that

the evidence showed that Swims had lied to Shepard.  Rather, the prosecutor's repeated insistence

that she thought everyone in the courtroom was assured of the truthfulness of both Shepard and

Swims's testimony could easily be interpreted to impart to the jury her personal belief as to the

credibility of these witnesses' testimony.  *See Hart*, 640 F.2d at 859 ("[t]he threshold determination

should be whether counsel's comments can be reasonably construed to be based on personal

belief.").  As we have noted before,  statements that suggest a prosecutor's belief, even if only

preceded by "I submit" or "I think," "can be reasonably construed to be based on personal belief."

*United States v. Krebs*, 788 F.2d 1166, 1176-77 (6th Cir. 1986); *see also United States v. Manthey*,

92 Fed. Appx. 291, 296 (6th Cir. 2004) (unpublished opinion) (finding the statement "No question

about it, he's telling the truth" to be "unquestionably improper").  The prosecutor's use of "I think,"

along with her use of the phrase "we are all assured," as opposed to, for example, "you should be

assured," could thus easily be construed to have been based on the prosecutor's personal beliefs.

Further, the fact that the witnesses' credibility was central to the case does not mitigate any

impropriety.  *See, e.g.*, *Modena*, 302 F.3d at 634 (finding vouching for key co-conspirator to be

improper); *Francis*, 170 F.3d at 550-51 (finding improper a prosecutor's opening argument that a

key witness would be certain to tell the truth because the witness's sentence would depend on

whether or not the prosecutor personally believed the witness); *United States v. Carroll*, 26 F.3d

1380 (6th Cir. 1994); *see also United States v. Lewis*, 69 Fed. Appx. 748, 756 (6th Cir. 2003)

(Moore, J., concurring).  Where credibility is a significant issue, a jury may place more weight on

the beliefs or opinions of federal prosecutors, whom jurors may believe have special expertise or

experience in evaluating witness testimony and credibility.  *See Cargle v. Mullin*, 317 F.3d 1196,

1218 (10th Cir. 2003); *Bess*, 593 F.2d at 755; *United States v. Splain*, 545 F.2d 1131, 1134-35 (8th

Cir. 1976); *see also Berger v. United States*, 295 U.S. 78, 88-89 (1935) (holding prosecutors to a

higher standard than other attorneys with regard to improper commentary at trial). Accordingly,

statements expressing the prosecutor's belief that the entire courtroom was assured of the veracity

of Swims' and Shepard's testimony, were improper.

Legette-Bey next complains about the prosecutor's reference to Swims's statements to an

FBI investigator following his plea agreement. The prosecutor, having just referred to the terms of

Swims's plea agreement that required him to cooperate and testify truthfully, noted that Swims could

not have known what the agent knew about the bank robberies, and thus would have jeopardized his

plea agreement had he lied to the agent, since he would not be able to know if she knew he was lying

or not. The prosecutor then stated:

> I submit to you, ladies and gentlemen, that the way he got around this problem might
> have been to tell [the investigator] the truth, because if he told the truth, then it
> couldn't come back and bite him. And when he told the truth, he necessarily told on
> the other robber. . . .
>
> Because if he got caught, if he got caught trying to outsmart Agent Rhoads and his
> information was not truthful, then I think he would have been way worse off than if
> he told the truth.

It has long been well-settled law that a prosecutor, in closing argument, may refer to the

terms of a plea agreement that require a witness to testify truthfully. *Francis*, 170 F.3d at 550.

Further, in the instant case, the terms of the plea agreement were in the record, as was the fact that

Swims likely would face significant additional imprisonment if he did not testify truthfully.

Accordingly, the prosecutor was merely highlighting the fact, already presented to the jury by

counsel for the defendant during his cross-examination of Swims, that Swims had significant incentives to testify truthfully. The mere addition of "I submit" does not render a statement automatically improper, since such a statement is not the equivalent of expressing a personal opinion. *See United States v. Stulga*, 584 F.2d 142, 147 (6th Cir. 1978). With regard to this particular statement, then, the prosecutor did not impart her own imprimatur or that of the government to Swims's testimony; rather, she merely reminded the jury of the terms of Swims's agreement and of the fact that he had significant incentives to testify truthfully. Thus, this statement was not improper.

Legette-Bey also complains about the prosecutor's statement in rebuttal that "[t]here was testimony here today, and I submit to you absolutely true, that Jerry Swims had cut his forehead." This statement was important to the prosecution because the passenger in the Ford Contour was slightly injured when he had hit his head on the windshield, whereas the driver had been protected by an airbag, and because the prosecution's theory was that Legette-Bey had been driving the Contour when it crashed. However, since Legette-Bey argued he was never in the car at all, he never disputed that Swims's forehead had been injured. Legette-Bey's defense theory was that he had lent the car to the robbers and accidentally forgotten his coat, with his wallet and other belongings, in the back seat of the car, but that he had had nothing to do with any bank robbery; and that Garrett and Swims, who were good friends, were each implicating Legette-Bey in order to shorten their own sentences. However, even if such a statement were improper, it could not have prejudiced the defendant's case, because Legette-Bey did not contest the fact of Swims's injury. Thus, regardless of whether the statement constitutes improper vouching, it could not have

"undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice."

*Young*, 470 U.S. at 14-15.

Finally, Legette-Bey complains about one of the prosecutor's final statements during her

argument in rebuttal:

> You could tell on the stand, I believe, that Eric [Garrett] was trying his best every time a question was asked to think about what he knew and to tell the truth. He even talked about how he would refer to Edward Legette-Legette-Bey as the Mo.
>
> He tried as best he could, and I submit to you that what he testified to on the stand was absolutely true and was verified by the fact that when he was picked up on May 21st, 2002, he told about his involvement in the robbery and about Edward Legette-Legette-Bey's involvement in that robbery and in the prior robbery on July 24th, 2002.

This statement could easily be interpreted as an attempt by the prosecutor to claim both that she

could tell that Garrett was trying his best to testify truthfully, and also that she believed his

testimony. It was thus improper. *See, e.g.*, *Modena*, 302 F.3d at 635.

b. Were the Statements Flagrant?

Having determined that two of the prosecutor's statements were improper, we next turn to

whether the statements were "exceptionally flagrant," undermining the fundamental fairness of the

trial and resulting in a miscarriage of justice. *Carter*, 236 F.3d at 783; *see also Carroll*, 26 F.3d at

1385 n.6. The first of the four *Carter* factors requires us to determine whether the two statements

tended to mislead the jury as to the evidence. The statements could have prejudiced the defendant,

both by suggesting to the jury that Swims's initial statements to the police were lies, and thus that

his later statements and testimony at trial were true; and by suggesting, on rebuttal, that the

prosecutor believed that Garrett's testimony — the main corroborating evidence for Swims's

testimony — was true. *See, e.g.*, *Modena*, 302 F.3d at 635. The cases against Legette-Bey, at least with regard to the four prior robberies and the July 24, 2001 robbery of the Charter One Bank, were based largely on Garrett's and Swims's testimony. Their credibility was thus the central issue in the trial. Consequently, the prosecutor's vouching for each of these two witnesses in the closing argument, especially with regard to her comments regarding Garrett on rebuttal ("You could tell on the stand, I believe, that Eric [Garrett] was trying his best every time a question was asked to think about what he knew and to tell the truth." and "He tried as best he could, and I submit to you that what he testified to on the stand was absolutely true . . . ."), may have bolstered the jury's belief in the testimony provided by Swims and Garrett. *See, e.g.*, *United States v. Dandy*, 998 F.2d 1344, 1353 (6th Cir. 1993) (finding no reversible error, but also stating the statements at issue were "not as egregious as [they] might have been had the prosecutor used the phrase 'I believe' that [a key trial witness] is honest."). Accordingly, this first prong weighs in Legette-Bey's favor, though not strongly, as the statements were not in any way misleading, nor has Legette-Bey presented any convincing evidence of prejudice.

Second, the statements were isolated, in that one occurred in the prosecution's closing argument, and the other on rebuttal, and each related to a different witness. Further, neither occurred in proximity to any other impermissible statement. As a result, this factor weighs in the government's favor.

Third, there is no evidence that the remarks were deliberately made; though the prosecutor repeatedly used "I believe" and "I think," the statements were not part of a larger pattern of placing the prosecutor's beliefs before the jury, nor has Legette-Bey presented any evidence or other

indication that the statements were willful, deliberate attempts to circumvent the rules of trial practice. Further, the statements, while improper, do not by themselves suggest deliberate or malicious intent. Accordingly, this factor also weighs in the government's favor.

Fourth, the evidence against the defendant was strong in some areas and weak in others. As for the May 21, 2002 First Federal robbery, there was significant evidence linking Legette-Bey to the crime beyond the testimony of Swims and Garrett, including the car, the wallet, and the fact that Legette-Bey was found not far from the wrecked Ford vehicle. While the jury was free to weigh this evidence in any manner it saw fit, the evidence certainly was sufficient to support a conviction even without the testimony of the two co-conspirators. Thus, this prong weighs strongly in favor of the government with respect to the last robbery.

However, with regard to the other robberies, Legette-Bey's defense theory was that Swims and Garrett robbed the banks, and that Swims was lying about the robberies in order to protect his friend Garrett. Absent Swims and Garrett's testimony, Legette-Bey argued that the government had little evidence linking him to five of the robberies. That evidence effectively consisted of the fact that a Ford F-150 pickup truck of the type Legette-Bey owned was used to flee from one robbery and the fact that he owned clothes that matched those in a photograph of the robber in another one of the robberies. Accordingly, had the jury not believed Swims and Garrett, for whose testimony the prosecutor had improperly vouched, there was little evidence to support a conviction beyond a reasonable doubt on each of these counts. Thus, with regard to the five prior robberies, the fourth prong weighs in Legette-Bey's favor.

The purpose of the four-factor *Carter* test is simply to determine whether a prosecutor's conduct is so flagrant "such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *United States v. Young*, 470 U.S. 1, 14-15 (1985). On balance, we cannot say Legette-Bey has met his burden of showing that the improper vouching by the prosecutor was so flagrant as to cause his trial to be fundamentally unfair. Though the central issue of the trial was Swims's and Garrett's credibility, there was some physical evidence that tied Legette-Bey to the prior robberies, and the jury had plenty of opportunities to consider both sides' theories of the case and to evaluate the credibility of all the witnesses before them. Under a plain error analysis, we conclude that these two statements, taken in the context of the entire trial and the totality of the evidence, did not result in Legette-Bey receiving a fundamentally unfair trial.

Although we conclude that the prosecutor's improper vouching does not require a new trial, we note the following admonition expressed by the Supreme Court:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger*, 295 U.S. at 88.

Here, Legette-Bey did not object to the improper statements, and has not met his burden of proving plain error below. Though we cannot otherwise conclude that a fundamental miscarriage

of justice occurred, the prosecutor crossed the line between earnest and vigorous prosecution and clearly improper argument. In this instance, however, that unfortunate conduct does not mandate a new trial.

**B. Sufficiency and Weight of the Evidence**

Legette-Bey next claims that the evidence did not support a guilty verdict and that the verdict was against the weight of the evidence. Since Legette-Bey moved for acquittal prior to submission of the case to the jury, we review *de novo* "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Here, Legette-Bey claims that the evidence was insufficient to establish beyond a reasonable doubt his identity as one of the robbers. However, we have long held that both circumstantial evidence and the mere testimony of co-conspirators, can each be sufficient to support a guilty verdict. *Perez-Gonzalez*, 307 F.3d 443, 445-46 (6th Cir. 2002) (circumstantial evidence); *United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003) (co-conspirators). As a result, Legette-Bey's argument that there was insufficient evidence to support a conviction on any of the counts against him also must fail.

Further, it is true that a trial judge may "sit as a thirteenth juror" and consider the evidence to ensure that there is no miscarriage of justice. *See United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988). However, Legette-Bey's attorney never requested a new trial or a judgment notwithstanding the verdict on the ground that the jury verdict was "against the weight of the

evidence." Accordingly, because Legette-Bey did not pursue such a motion at trial, he cannot raise this argument now. *See, e.g.*, *Dixon v. Montgomery Ward*, 783 F.2d 55, 55 (6th Cir. 1986).

**D. Speedy Trial Claims**

*1. Pre-Indictment Delays*

Legette-Bey next argues that his Speedy Trial Act rights were violated when he was held in state custody for several months before the filing of federal charges against him. On appeal of Speedy Trial Act-based claims, this Court reviews the district court's findings of fact for clear error and its legal determinations *de novo*. *United States v. O'Dell*, 154 F.3d 358, 360 (6th Cir. 1998). Under the Speedy Trial Act, a defendant must be indicted within thirty days of his federal arrest or the service of federal charges. 18 U.S.C. § 3161(b); *see also United States v. Murphy*, 241 F.3d 447, 454 (6th Cir. 2001). Here, the defendant was arrested by state officials on May 21, 2002, following his discovery in the garage, and placed in state prison. He was not federally indicted until August 28, 2002, a date more than thirty days after his arrest. Thus, the question before us is whether time spent in state custody counts as time after a federal arrest for the purposes of the Speedy Trial Act.

Time spent in state custody on related charges does not count as a "federal arrest," even if state and federal officials are cooperating on a defendant's case or related cases. *United States v. Blackmon*, 874 F.2d 378, 381 (6th Cir. 1989). However, we have set forth an exception from this rule when state and federal officials have a "working arrangement" with the state designed to allow facilitation of interrogation of federal suspects without the triggering of various federal rights, including the right to a speedy indictment. *United States v. Mayes*, 552 F.2d 729, 734 (6th Cir. 1977).

Here, Legette-Bey was held in a state corrections facility because he was arrested by state officials on state charges, for which he was indicted in state court. The state charges were dismissed on November 1, 2002, long after Legette-Bey had been charged federally. No federal charges were formally filed prior to the return of the indictment on August 28, 2002. The fact that Legette-Bey was federally indicted after he was arrested on state charges, or that federal and state officials cooperated in his case, does not evidence any sort of a "working arrangement" between state and federal officials that deprived Legette-Bey of his speedy trial rights. Rather, the evidence simply shows that Legette-Bey was arrested on state charges in May of 2002. The fact that these charges were later dropped in favor of a federal indictment does not implicate Legette-Bey's federal speedy trial rights, which only accrued on August 28, 2002, at the time of the return of his federal indictment. Thus, Legette-Bey's pre-trial Speedy Trial Act rights were not violated.

*2. Post-Indictment Delays*

Under the Speedy Trial Act, a defendant's trial must begin within seventy days of his first appearance before a judicial officer in federal court. 18 U.S.C. § 3161(c). Legette-Bey was arraigned on September 17, 2002, the date that the government and Legette-Bey agree triggered the counting of the seventy days. Further, both parties agree that trial began on May 28, 2003, 270 days later. Accordingly, both parties agree that Legette-Bey has established a *prima facie* case that the Speedy Trial Act was violated. *See United States v. Jenkins*, 92 F.3d 430, 438 (6th Cir. 1996) (noting that a defendant must merely "produc[e] a calendar and show[] that more than seventy days have passed . . . ."). The burden then shifts to the government to prove by a preponderance of the evidence that a sufficient number of days were excludable from counting under the Act such that

- 19 -

non-excluded days do not total more than 70 days. *Id*. Further, a judge's decision to grant an "ends-of-justice continuance" under the Act is reviewed for abuse of discretion.

Under the Act, various periods are excludable from the seventy-day period, including time spent waiting for information necessary to decide pre-trial motions, time spent with motions under advisement, and, under 18 U.S.C. 3161(h)(8), any "other proceedings" for which the 'ends of justice' outweigh the interests of the public and the defendant in a speedy trial." *United States v. Monger*, 879 F.2d 218, 220 (6th Cir. 1989). In addition, this Court has recognized that excludable time attributable to one co-defendant is excludable with regard to all other co-defendants, even if the matter is not in any way related to another co-defendant. *United States v. Snelling*, 961 F.2d 93, 95 (6th Cir. 1991).

The district court granted ends-of-justice continuances in the instant case to allow each of the three defendants named in the initial indictment — that is, Swims, Garrett, and Legette-Bey — to have a pre-trial pre-sentence report prepared, and also for plea negotiations. In Legette-Bey's reply brief, he effectively concedes that these periods of time are the only contested ones concerning his post-indictment Speedy Trial Act claim. If such continuances had not been granted, Legette-Bey would have had to have been tried by November 30, 2002, seventy days after his September 17 arraignment. Aside from the continuances for the preparation of a pre-trial sentence report, no other significant activity occurred in the case until at least January 6, 2003, when a pretrial conference for Swims and Garrett was held. Accordingly, since Legette-Bey was clearly not tried by November 30, 2002, if preparation of pre-trial sentence reports is not a valid reason for granting a continuance under the Speedy Trial Act, the government violated the Act.

We have previously held that time for plea negotiations is excludable under the Act. *See, e.g.*, *United States v. Dunbar*, 357 F.3d 582, 588 (6th Cir. 2004), *cert. granted and judgment vacated on other grounds*, 125 S. Ct. 1029 (2005); *United States v. Bowers*, 834 F.2d 607, 609-10 (6th Cir. 1987); *see also, e.g.*, *United States v. Cano-Silva*, --- F.3d ----, 2005 WL 698983 (10th Cir. Mar. 28, 2005) ("Periods of time devoted to negotiating plea agreements are not explicitly excluded from calculation, but such delays may be excluded if the district court determines that the ends of justice served by granting a continuance and excluding the time from calculation outweigh the best interest of the public and the defendant in a speedy trial." (citing 18 U.S.C. 3161(h)(8))). As the government notes, there do not appear to be any cases directly holding that time needed for creation of a pre-sentence report to be used in pre-trial plea negotiations can be excluded on ends-of-justice grounds. However, one can hardly fault a defendant for requesting extra time in order to be informed about the sentence he may face if he does not reach a plea agreement. Pre-trial sentencing reports serve to make guilty pleas more informed and can assist in encouraging pleas, thus advancing efficiency in the judicial process, especially when such reports are requested by defendants. Thus, if time for plea negotiations is to be excluded, and if time required for a court to gather information needed to decide a defendant's motion is excludable, *Jenkins*, 92 F.3d at 438, the time needed for creation of a pre-sentence report at a defendant's request, as here, should be excludable. At the very least, holding such time excludable cannot be said to be so unreasonable that it was beyond the district judge's discretion. We therefore conclude that there as no violation of the Speedy Trial Act.

**E. Sentencing Claim**

- 21 -

Finally, Legette-Bey claims that his sentence is unconstitutional under the Eighth Amendment because it is "grossly disproportionate" both to the crimes he committed and to the sentence received by Swims. When reviewing sentencing decisions, this Court reviews a district court's legal conclusions *de novo*. *See United States v. Hazelwood*, 398 F.3d 792, 795 (6th Cir. 2005). However, since Legette-Bey failed to raise this claim below, we review the sentence for plain error, determining if there was "(1) error, (2) that is 'plain,' [] (3) that 'affects substantial rights,' . . . [and] (4) [if] the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Oliver*, 397 F.3d 369, 378 (6th Cir. 2005) (citing *Johnson v. United States*, 520 U.S. 461, 466 (1997)).

In reviewing whether a sentence violates the Eighth Amendment, a defendant must show that the sentence is "grossly disproportionate" to the crime committed. *Coleman v. DeWitt*, 282 F.3d 908, 915 (6th Cir. 2002) (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001-05 (1991) (Kennedy, J., concurring)). In order to determine whether a sentence is grossly disproportionate, we examine the gravity of the offense, including whether the crime was violent and the seriousness of the offense. *See United States v. Hill*, 30 F.3d 48, 50-51 (6th Cir. 1994). Further, statutorily required concurrent sentences on multiple counts are unlikely to be seen as disproportionate merely because of the concurrent-sentencing requirement; if each sentence on its own is constitutional, the resulting concurrent sentences are likely, *in toto*, to be constitutional. *United States v. Beverly*, 369 F.3d 516, 537 (6th Cir. 2004) ("Mandating consecutive sentences is not an unreasonable method of attempting to deter a criminal, who has already committed several offenses using a firearm, from doing so again."). In the instant case, the defendant was convicted of six counts of armed bank robbery,

six counts of using a firearm during a crime of violence, and one count of being a felon in possession

of a firearm. Under 18 U.S.C. § 924(c), the sentences for the firearms violations are required to be

served consecutive to the sentences for the underlying offenses. Here, because five of the six

firearm violations were "second or subsequent" offenses, each resulted in a mandatory minimum

consecutive sentence of 300 months, or 25 years each. *See, e.g*, U.S.S.G. 2K2.4 (2003). This, in

addition to sentences of 84 months on the first firearm violation and 262 months total for the six

bank robberies, led to the district court imposing a sentence totalling 1,846 months, or approximately

154 years.

Legette-Bey's sentence was not grossly disproportionate to the crimes for which he was

convicted. With regard to the firearm violations, the judge sentenced Legette-Bey to the statutory

minimum. *See* 18 U.S.C. §§ 924(c)(1)(A)(ii); 924(c)(1)(C)(i); *Beverly*, 369 F.3d at 536 (considering

mandatory consecutive sentences for firearm use in bank robberies, and determining that sentences

similar to those received by Legette-Bey were not unconstitutional). As for the underlying bank

robbery charges, if one allocates the 262-month sentence for each armed robbery of a federally

insured bank, then Legette-Bey received about three-and-a-half years for each such crime. This

sentence is hardly "grossly disproportionate" to the crimes of which Legette-Bey was convicted,

each of which included threatening harm to many bank employees and customers. Therefore,

Legette-Bey's sentences does not violate the Eighth Amendment by being grossly disproportionate

to the crimes of which he was convicted.

Legette-Bey also argues that his sentence was "grossly disproportionate" to that received by

Swims, who pleaded guilty. However, we have held that sentencing disparities between co-

defendants charged with similar crimes does not in and of itself suggest an Eighth Amendment violation. *See, e.g.*, *Terry v. Trippett*, No. 94-2044, 1995 WL 469424 (6th Cir. Aug. 7, 1995). Here, Swims entered into a plea agreement, avoiding the need for the government to try him on the charges against him. Legette-Bey, on the other hand, elected to go to trial. Therefore, the length of Legette-Bey's sentence was in no way unconstitutionally disproportionate to his crimes.

## III.

For the foregoing reasons, we **AFFIRM** Legette-Bey's conviction and sentence.