**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0218n.06
Filed: March 23, 2009

**No. 08-1407**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **MICHAEL RAEDEKE**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Petitioner-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **JAN TROMBLEY**, Warden, | ) | **O P I N I O N** |
| | ) | |
| *Respondent-Appellee.* | ) | |

**BEFORE:** KEITH, COLE, and McKEAGUE, Circuit Judges.

**COLE, Circuit Judge.** Petitioner Michael Raedeke seeks a writ of habeas corpus under 28 U.S.C. §§ 2241 and 2254. Raedeke challenges his conviction for first-degree murder on several bases, including the admission of incriminating statements in alleged violation of *Miranda*, prosecutorial misconduct, juror inability to hear trial proceedings, and ineffective assistance of trial and appellate counsel. The district court denied Raedeke's petition. For the following reasons, we **AFFIRM**.

**I. BACKGROUND**

**A.     Factual history**

Raedeke was accused of killing 87-year-old Rose Hickey by striking her in the head with a baseball bat after breaking into her home. The facts of the crime, as adduced at trial, are set forth in the district court's opinion:

### 1. Key Prosecution Witnesses

Kevin Richardson testified that Petitioner left home four times on the night in question. The first time Petitioner left with Justin Heiser and Eric Shann. They came back with two bags of golf clubs. The same three young men left a second time. Richardson subsequently received a telephone call from Justin Heiser, who stated that they had thrown a rock at a lady's patio and set off an alarm. Petitioner, Justin, and Eric returned to Petitioner's home, but Petitioner left the house a third time. He returned and said that the lady had grabbed his arm. He had a radio, television, and some beer with him, and he stated that he could not have any witnesses and had some business to do. He then left once more, this time accompanied by Justin Heiser. When Petitioner returned home, he was carrying a baseball bat with blood on it and a coin container. Petitioner said that he had hit the lady on the head two times, paused, and then hit her a few more times.

Eric Shann admitted that he and Justin Heiser went for a walk with Petitioner on a Friday night in mid-October 1999. He claimed that Petitioner removed some golf clubs from a person's garage and that the group took the golf clubs back to Petitioner's home. The three of them went out a second time. They lost track of Petitioner, but heard an alarm sound. Eventually, all three of them returned to Petitioner's house. Petitioner then picked up a baseball bat and stated that he had to take care of business. He and Justin Heiser left the house. The two of them returned home separately. Petitioner was carrying the bat, which had blood on it, and Justin was carrying a barrel of pennies. Petitioner said that he had hit the lady with the bat eight times and that he had never killed anyone before that night.

Justin Heiser admitted to helping Petitioner steal two bags of golf clubs on a Friday night in October of 1999. He also admitted to being with Petitioner and Eric Shann when a burglar alarm was triggered later that night. He returned to Petitioner's home and observed Petitioner leave the house a third time. When Petitioner came back, he stated that he had got into an old lady's house and, as he was going through the house, the lady woke up, grabbed his arm, and looked at him. Petitioner asked for a volunteer to help him take care of some business. He said that he could not have any witnesses. Justin offered to help, and the two of them went to a house where the back patio window was broken. Petitioner had a wooden baseball bat and some gloves with him. Justin initially stayed outside while Petitioner went in the house. Justin heard some thumping noises and decided to go inside to look for something to steal. He walked into a bedroom and saw someone lying in a bed. Petitioner met him in the kitchen and gave him a barrel of coins, which he carried back to Petitioner's house. Petitioner returned home with the bat and stated that he had never previously killed anyone. Then he cried and instructed Justin not to say

anything to anyone.

Justin informed the police that Petitioner had said he hit the victim with the bat and that she made a moaning noise. Then he hit her a couple more times until she gurgled blood. He continued to hit her until she stopped moving.

Charles ("Wes") Heiser was Justin Heiser's older brother. He testified that, mid-October 1999, Petitioner pointed out a house on Craig Street and stated that he broke into the house during the previous night and killed a lady who was present in the house. Petitioner explained to Wes that he broke a window in the house and set off an alarm, but later went back to the house and beat the woman to death with a ball bat because she woke up when he looked under the bed. Petitioner showed Heiser a cut on his leg, which he said that he received when he kicked in the window. He also showed Heiser some things that he had taken from the house.

Petitioner informed Jered Grierson that he cut his leg on a fence. Jered learned about the murder from Wes Heiser, who informed him what Petitioner had said to him. According to Jered, who spent about two or three hours at Petitioner's home on the night in question, Petitioner was drinking Tequilla [sic] and beer that night.

William Harris heard about the incident from Jered Grierson. William asked Petitioner if he really did it and why. Petitioner then put his head down, started to cry, and said, "I don't know." Petitioner asked William for help in obtaining a bus ticket and, after his arrest, Petitioner wrote to William from jail. In his letters, Petitioner stated that he wore leather gloves and left no fingerprints, and he mentioned that some of his friends had "snitched" on him.

## 2. Defense Witnesses

The defense theory was that, due to Petitioner's history of behavioral, physiological, and psychological problems, as well as his use of alcohol and drugs on the night of the offense, he was not in control of himself and lacked the intent needed to be found guilty of first-degree murder and home invasion. A clinical psychologist testified that Petitioner was not mentally ill, nor mentally retarded, but that he had an "oppositional deviant disorder" or anti-social type of personality disorder with a possible attention deficit disorder. A physician testified that Petitioner was hyperactive and "mouthy" as a child and that she treated him for multiple allergies. Petitioner's grandmother testified that Petitioner had problems at school because he lacked social skills, was "mouthy," could not concentrate, and was disrespectful.

(Joint Appendix ("JA") 85-87.)

When the police received information implicating Raedeke in the murder, Officer Terry Van Keuren of the Flint, Michigan Police Department located and arrested Raedeke on a street in Flint. On direct examination, Van Keuren testified about the nature of the arrest as follows:

> When I approached Mr. Raedeke he - - I advised him that he was under arrest. And I said, do you know why you are under arrest? And he started crying. And he shook his head and said yes. And he said, but I was doping and drinking when I did it.

(JA 167.) In the prosecutor's closing argument, he referred to this testimony, stating to the jury: "I don't have to depend just on those friends of [Raedeke's]; [Raedeke] admits to Sgt. Van Keuren that he killed her, saying that he was drinking and doping when I did it. When he killed Rose Hickey. That's what Sgt. Van Keuren testified to." (JA 266.)

## B. Procedural history

In May 2000, following a trial in the Genesee County Circuit Court, a jury convicted Raedeke of first-degree premeditated murder, felony murder, and first-degree home invasion. He was sentenced to life imprisonment without the possibility of parole on both murder convictions and a concurrent sentence of ten-to-twenty years of imprisonment on the first-degree home invasion conviction.

In February 2001, Raedeke appealed to the Michigan Court of Appeals raising two claims: first, that the trial court erred in refusing to instruct the jury on manslaughter; and second, that Raedeke's conviction on two counts of murder and one count of home invasion violated the Double Jeopardy Clause. The appeals court rejected the first argument, holding that the record did not support a verdict of manslaughter, but agreed with Raedeke's second argument and corrected his

sentence to reflect a single conviction and sentence for first-degree murder. *People v. Raedeke*, No. 229128, 2002 Mich. App. LEXIS 711 (Mich. Ct. App. May 14, 2002). Raedeke filed an application for leave to appeal the manslaughter-instruction claim, which the Michigan Supreme Court denied. *People v. Raedeke*, 656 N.W.2d 525 (Mich. 2003) (Table).

Raedeke then filed a motion for relief from judgment in the Genesee County trial court under subchapter 6.500 of the Michigan Court Rules ("MCR"), which provides for post-appeal relief. Raedeke raised the same claims now presented in his habeas petition. On January 31, 2004, the trial court denied his motion on the merits in an oral opinion. *People v. Raedeke*, No. 99-5112-FC (Genesee County Cir. Ct. Feb. 10, 2004). Raedeke filed an application for leave to appeal and a motion to remand for an evidentiary hearing in the Michigan Court of Appeals, which that court denied in a one-sentence order, stating, "The delayed application for leave to appeal is DENIED for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Raedeke*, No. 256349 (Mich. Ct. App. Dec. 16, 2004) (unpublished) (JA 136). Raedeke sought leave to appeal to the Michigan Supreme Court, which also denied his request in a one-sentence order referring to MCR 6.508(D). *People v. Raedeke*, 706 N.W.2d 23 (Mich. 2005).

In December 2005, Raedeke filed a federal habeas petition in the Eastern District of Michigan. The district court denied relief but granted a certificate of appealability on all five of Raedeke's claims. *Raedeke v. Trombley*, No. 05-60276, 2008 U.S. Dist. LEXIS 14904 (E.D. Mich. Feb. 28, 2008) (denial of petition); *Raedeke v. Trombley*, No. 05-60276, 2008 U.S. Dist. LEXIS 23804 (E.D. Mich. Mar. 26, 2008) (grant of certificate of appealability). Raedeke timely appealed to this Court.

## II.  ANALYSIS

### A.  Procedural default

Like the district court, rather than determine whether Raedeke's claims have been procedurally defaulted, we will dispose of them based on their lack of merit.  *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003) (a federal court may decide a case against a habeas petitioner on the merits without addressing potential procedural default).

### B.  Standard of review

We review de novo the district court's ruling on Raedeke's habeas petition.  *See Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009).  The standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, governs our review:

> AEDPA prohibits a federal court from granting a writ of habeas corpus to a person in custody pursuant to a state court judgment with respect to a claim that was adjudicated on the merits in state court unless the adjudication of that claim --
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Morales v. Mitchell*, 507 F.3d 916, 929 (6th Cir. 2007) (quoting *Moss v. Hofbauer*, 286 F.3d 851, 858 (6th Cir. 2002) (quoting AEDPA, 28 U.S.C. § 2254 (d))).  The phrase "clearly established" federal law refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as

of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id*. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a "state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id*. at 407. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410. We ask, therefore, "whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.

**C.    Raedeke's statement was properly admitted and commented upon at trial**

Raedeke makes two related claims arising from his statement to Officer Van Keuren at the time of his arrest that he was "drunk and doping when [he] did it": (1) Raedeke claims the statement should have been suppressed because Van Keuren did not give him *Miranda* warnings before asking, "Do you know why you are under arrest?"; and (2) Raedeke claims that the prosecutor committed misconduct when he told the jury, during closing argument, that Raedeke "admit[ted] to Sgt. Van Keuren that he killed her, saying that he was drinking and doping when [he] did it. When he killed Rose Hickey. That's what Sgt. Van Keuren testified to." (JA 266.) Raedeke argues that this misstated Van Keuren's testimony and, therefore, constituted improper argument of facts not in evidence.

   1.    *Admissibility of Raedeke's statement*

Initially, we must resolve an important factual issue. In denying Raedeke's post-appeal motion, the state trial judge stated that "when cross-examination was completed, the clear import to be given to VanKuren's [sic] testimony was that he did not interrogate the defendant, but that he made a positive statement." (JA 128.) The trial judge continued, finding that Van Keuren's testimony on cross-examination established that his utterance to Raedeke "was not a question. It was not interrogation. It was, you are under arrest, you know what you are under arrest for. Not in the form of a question." (JA 128.) Raedeke has not included the transcript of Van Keuren's cross-examination in the joint appendix nor provided any argument to rebut the trial judge's characterization of the testimony, so we accept the trial judge's finding that Van Keuren's comment to Raedeke was an affirmative statement not intended to elicit a response. *See Jells v. Mitchell*, 538 F.3d 478, 484 (6th Cir. 2008) (stating that, on habeas review, state-court findings of fact are entitled to a presumption of correctness, which the petitioner has the burden of rebutting by clear and convincing evidence) (citing 28 U.S.C. § 2254(e)(1)); *see also United States v. McConer*, 530 F.3d 484, 495-96 (6th Cir. 2008) (stating that whether interrogation occurred may be partly a factual finding that is owed deference, particularly where the record is ambiguous). With that understanding of the facts, we turn to whether Van Keuren's statement to Raedeke at the time of his arrest violated *Miranda*.

*Miranda* warnings must be issued prior to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." *Oregon v.*

*Elstad*, 470 U.S. 298, 307 (1985). "Custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980) (footnotes omitted). In *Innis*, police arrested a robbery suspect but were unable to locate the gun they believed he had used to commit the crime. *Id*. at 294-95. In the defendant's presence, one officer said to another, "there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves." *Id*. The defendant then volunteered to show the officers where he had hidden the gun. *Id*. at 295. The Court held that the officers' conversation did not constitute interrogation for a combination of reasons: there was "no express questioning," the "entire conversation appears to have consisted of no more than a few offhand remarks," rather than a "lengthy harangue in the presence of the suspect," and the record "in no way suggest[ed] that the officers' remarks were *designed* to elicit a response." *Id*. at 302-03 & n.9. The Court also noted that

the comments were not particularly "evocative" and that there was no evidence that the officers were aware that the suspect was "peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children." *Id*. at 302-03.

Under the reasoning of *Innis*, Van Keuren's statement to Raedeke was not interrogation requiring prior issuance of *Miranda* warnings. Van Keuren's remark to Raedeke was not an express question, nor a "lengthy harangue," nor particularly "evocative." 446 U.S. at 302-03. As far as the record shows, Van Keuren did not have reason to suspect that Raedeke would be unusually susceptible to his remark. *See id*. at 302. As in *Innis*, the facts of this case showed that Van Keuren's remark was not designed to elicit a response from Raedeke. *Id*. at 303 n.9.

While it might conflict with *Miranda* and *Innis* to allow police officers to ask a direct question in the moments following a defendant's arrest with the intention of eliciting incriminating information, those are not the facts the trial judge found here. In this case, the state court's decision that Van Keuren's statement to Raedeke was not interrogation was reasonable in light of *Innis*.

### 2. *Prosecutorial misconduct*

Raedeke claims that the following statement made by the prosecutor in his closing argument was misconduct that deprived Raedeke of a fair trial: "[Raedeke] admits to Sgt. Van Keuren that he killed her, saying that he was drinking and doping when I did it. When he killed Rose Hickey. That's what Sgt. Van Keuren testified to." (JA 266.) This comment was not improper, and even if it was, it would not entitle Raedeke to relief.

"[W]hen addressing claims of prosecutorial misconduct, we first determine whether the challenged statements were indeed improper." *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

"Upon a finding of such impropriety, we then 'look to see if [the improper statements] were flagrant and warrant reversal.'" *Id.* (quoting *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999)). We use a four-factor test to analyze the flagrancy of alleged instances of prosecutorial misconduct: (1) whether the prosecutor's statements tended to mislead the jury or prejudice the accused; (2) whether the misconduct was isolated or extensive; (3) whether the misconduct was deliberate; and (4) the total strength of the evidence against the accused. *Id.* To obtain relief, a petitioner must establish that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "Under AEDPA, this bar is heightened by the deference we give to the [state court's] determination of [petitioner's] prosecutorial-misconduct claims." *See Bowling v. Parker*, 344 F.3d 487, 513 (6th Cir. 2003).

The prosecutor was free to argue to the jury that Raedeke was referring to the murder of Rose Hickey when he told Van Keuren that he had done "it." *See Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005) (noting that prosecutors may "forcefully assert reasonable inferences from the evidence"). On the other hand, prosecutors may not misrepresent facts in evidence nor assert facts not admitted into evidence. *See Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000). While there is some room for disagreement about whether the prosecutor made it sufficiently clear that he was drawing an inference from Van Keuren's testimony, rather than purporting to repeat the testimony verbatim, it was reasonable for the trial court to conclude that the jurors would have understood the prosecutor to be arguing for a reasonable inference.

Even if we were to assume that the prosecutor improperly characterized Van Keuren's

testimony, this would not constitute the kind of flagrant misconduct that would entitle Raedeke to habeas relief. Because the jurors had heard Van Keuren's testimony themselves, the prosecutor's comment did not have a strong tendency to prejudice Raedeke. *See Million*, 201 F.3d at 717 (setting forth factors of flagrancy analysis). Furthermore, the comment was isolated and does not seem to have been a deliberate error, since the prosecutor appears to have been arguing for a fair inference based on admitted testimony. *Id*. In addition, the overall case against Raedeke was extremely strong. *Id*. Thus, Raedeke's prosecutorial-misconduct claim fails.

**D.      Jury's ability to hear the proceedings**

Ruling on Raedeke's post-appeal motion for relief from judgment, the trial court reviewed the transcript citations set forth by Raedeke where the record reflected inaudible comments or discussions of hearing difficulties and found that the asserted instances, both individually and collectively, were not significant and did not deprive Raedeke of his due process rights. Bound as we are by the strictures of AEDPA, we find that this determination was reasonable. *See, e.g.*, *White v. Mitchell*, 431 F.3d 517, 537 (6th Cir. 2005) (reviewing trial court's determinations with respect to juror bias under the AEDPA standard). A review of the inaudible comments shows that they were minor and did not obscure substantive testimony. Moreover, the judge and both parties' attorneys were attentive to the jurors' ability to hear the testimony. Raedeke has not presented a colorable argument that the trial court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law.

**E.      Ineffective assistance of trial counsel**

Raedeke claims he received ineffective assistance of trial counsel because his lawyer did not

object to the admission of Van Keuren's testimony about Raedeke's incriminating statement, the prosecutor's commentary on that testimony, or the alleged hearing problems during the trial. Raedeke also claims that his trial counsel improperly conceded Raedeke's guilt and that counsel was deficient in choosing to present a "diminished capacity" defense despite being unable to present any witnesses to testify that Raedeke was unable to form the requisite intent and despite the fact that the Michigan Supreme Court later held the defense to be unavailable.

To prevail on a claim of ineffective assistance of counsel, Raedeke must demonstrate that his attorney's "performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. To satisfy the prejudice prong, Raedeke "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

*1. Failure to object*

Because the trial court did not err by admitting Van Keuren's testimony about Raedeke's incriminating statement and allowing the prosecutor to comment on that testimony, any objection by defense counsel would have been futile, and the failure to make futile objections cannot constitute deficient performance. *See United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000). With

respect to the claim that the jurors had difficulty hearing portions of the proceedings, Raedeke has not shown that this interfered with the trial such that he was prejudiced, and furthermore, Raedeke's counsel was attentive to the ability of the jurors to hear the proceeding. Trial counsel's failure to object on the grounds of hearing difficulties did not constitute ineffective assistance.

### 2. *Conceding guilt*

Raedeke argues that his trial counsel, in effect, caused him to plead guilty against his will when counsel argued to the jury, "The fact of the matter is that these boys from the neighborhood have all pretty much come together and established a set of circumstances that would indicate without peer venture [sic] any doubt, if they're accepted, that Michael Raedeke performed the acts for which he was accused." (JA 271.) However, Raedeke's counsel's candid acknowledgment of the evidence against his client did not amount to a clear concession of guilt, as counsel then proceeded to argue that the jury should find the witnesses' testimony not credible. Counsel's candor was clearly intended to boost his credibility with the jury, and under the deference owed to legal strategy by counsel, this did not amount to deficient performance. *See Florida v. Nixon*, 543 U.S. 175, 192 (2004) (holding that counsel was not ineffective for attempting to impress jury with his candor).

### 3. *Diminished-capacity defense*

Raedeke does not contest that the diminished-capacity defense was viable at the time of his trial. *See People v. Carpenter*, 627 N.W.2d 276, 280-82 (Mich. 2001) (deciding, subsequent to Raedeke's trial, that the diminished-capacity defense was no longer available). Raedeke asserts that his counsel was deficient in choosing to present a defense that was unsupported by evidence, but,

as the district court stated, there was evidence of diminished capacity, and the strategy was not unreasonable, though its chances of success were small. Raedeke does not offer a convincing argument that the district court's well-reasoned treatment of this issue was incorrect.

**F.      Ineffective assistance of appellate counsel**

Raedeke's appellate counsel raised two issues on direct appeal: (1) a double-jeopardy claim, which succeeded but did not result in a reduction of Raedeke's sentence; and (2) a claim based on failure to instruct the jury on manslaughter, which was denied. Raedeke argues that the first issue was futile, since it did not reduce Raedeke's sentence, that the second was frivolous, and that appellate counsel was ineffective for choosing to raise these two issues rather than those raised in the instant habeas petition. "A criminal appellant is constitutionally entitled to the effective assistance of counsel in his direct appeal." *Franklin v. Anderson*, 434 F.3d 412, 428-29 (6th Cir. 2006). Regardless of the wisdom of pursuing the two issues that appellate counsel did raise on appeal, the claims that Raedeke now argues should have been included all lack merit, so appellate counsel was not ineffective for failing to raise them. *See Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("[B]y definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit.").

## V.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision denying Raedeke's petition for a writ of habeas corpus.