**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lewis FRANCIS (97–1129) and Louay
Francis (97–1130), Defendants–
Appellants.**

Nos. 97–1129, 97–1130.

United States Court of Appeals,
Sixth Circuit.

Argued and Submitted April 20, 1998.

Decided Feb. 25, 1999.

Patricia G. Blake (briefed), Margaret E. Davis (argued), Office of the U.S. Attorney, Detroit, MI, for Plaintiff–Appellee.

Mark J. Kriger (argued and briefed), Detroit, MI, for Defendant–Appellant in No. 97–1129.

John L. Belanger (briefed), Sterling Heights, MI, Arthur Jay Weiss, Farmington Hills, MI, for Defendant–Appellant in No. 97–1130.

Before: MARTIN, Chief Judge; SUHRHEINRICH and SILER, Circuit Judges.

BOYCE F. MARTIN, JR., Chief Judge.

Defendants–Appellants Lewis Francis and Louay Francis, a father and son, appeal their jury convictions and sentences and the denial of their motion for a new trial. Specifically, they argue that the prosecutor engaged in improper vouching and made other inappropriate comments, that there was insufficient evidence to support several of the convictions, that the district court's jury instructions were in error, and that the district court erred in calculating their respective sentences. Although no single comment or set of comments by the prosecutor requires a new trial, the statements do, when taken as a whole, constitute reversible error.[1] We therefore REVERSE Defendants' convictions and REMAND the case for a new trial.

Lewis Francis began his banking career at the Ottoman Bank in Basrah, Iraq, where he worked for approximately fifteen years. In 1968, he and his family left Iraq for Kuwait, and Lewis began working for the Gulf Bank of Kuwait. By 1985, however, the family had emigrated to the United States and Lewis had established an international banking accounts department at the New York office of the Gulf Bank of Kuwait. When the office closed, Lewis moved to Michigan where the rest of his family resided.

In the early 1980s, Lewis Francis met Larry Walker, a drug dealer in Michigan. In late 1983, Mr. Walker gave Lewis $100,-000 in small denominations to open an account at the Gulf Bank of Kuwait. Mr.

Walker testified that he had informed Lewis that he did not want the government to be able to trace the money, and that Lewis told him "not to worry about it because it was an offshore bank and the money was going to Kuwait; they would never be able to trace it, they being the government."

In the mid–1980s, Mr. Walker introduced Lewis to Lincoln and Lancelot Williams, brothers who ran a large drug operation and supplied Mr. Walker with the drugs he then sold. Lincoln Williams testified that he and his brother wanted to open an overseas account at a Kuwaiti bank "to hide the money ... from the government ... because [it] was drugs money." Lewis opened an account for the Williams brothers, eventually depositing over $800,000. The money was generally brought in cash in small denominations to Lewis, who then wired the money to Kuwait.

In the late 1980s, the Williams brothers, Mr. Walker, and another colleague brought between $250,000 and $400,000 in small denominations to Lewis in New York City. They instructed him to wire the money to a European bank so that they could withdraw it there and then wire it to Zaire. However, they needed Lewis to assist them because the money was obtained from illegal drug sales. Lewis again agreed to help.

In 1991, around the time of the Gulf War, Lincoln Williams became concerned about the money he had deposited in the Gulf Bank of Kuwait. He met with Lewis to discuss these concerns on three or four occasions. Most of these meetings were arranged by Lewis's son, Louay Francis, who was also present for several of them.

In 1993, Mr. Walker was arrested in Florida on an unrelated drug charge. He decided to cooperate with the United States and contacted DEA Special Agent Michael Blackwood. Mr. Walker met with Agent Blackwood and told him about the Williams brothers' drug ring and the manner in which Lewis laundered money for the operation. Agent Blackwood decided to have Mr. Walker arrange a transaction between Lewis and

---

1. In light of this conclusion, the Francis' other claims are moot and do not merit discussion.

undercover DEA Agent Ken Adams, who would be known as Keith Black.

Mr. Walker made an initial phone call to Lewis on January 31, 1994, indicating that he wanted to meet with him. Because Lewis was feeling ill, he asked Mr. Walker to contact Louay instead, saying, "Louay ... he's authorized for everything ...." Mr. Walker then contacted Louay and spoke with him about the overseas accounts as well as his concerns as to whether the money was traceable. Although Louay was unable to answer every question posed by Mr. Walker, the transcripts of that taped conversation do indicate that he was quite knowledgeable about the operation.

On February 17 and 18, Mr. Walker and Louay held further conversations which were also recorded. They discussed the government's ability to trace the money in Mr. Walker's foreign account, and Mr. Walker told Louay that he needed to move approximately $700,000 to such an account. They discussed the possible transaction in considerable detail, and Louay arranged for Mr. Walker to meet with his father to discuss it further.

On March 2, Mr. Walker and Agent Adams met with Lewis, who agreed to launder approximately $3,000,000 to $3,700,000 for Agent Adams in $100,000 increments. On April 20, Mr. Walker and Agent Adams delivered the first $100,000 in cash to Lewis, who eventually deposited $90,000 into an account at Barclay's Bank in London. The deposit represented the money delivered to Lewis less his ten percent commission.

On February 8, 1995, as a result of this and other transactions, a grand jury indicted Lewis Francis and Louay Francis on a series of charges involving money laundering and sought criminal forfeiture. In a superseding indictment filed June 15, additional co-defendants were included, as were additional charges. A second superseding indictment was filed November 11, adding several new charges against Lewis Francis.

After a two week trial, a jury convicted Lewis Francis of one count of conspiracy to possess with the intent to distribute and to distribute controlled substances in violation of 21 U.S.C §§ 841(a)(1) and 846; one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 371; one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(a)(3)(B) and (h); one count of laundering monetary instruments in violation of 18 U.S.C. § 1956(a)(3)(B); one count of conspiracy to defraud the United States by impeding and impairing the Internal Revenue Service in violation of 18 U.S.C. § 371; and two counts of criminal forfeiture in violation of 18 U.S.C. § 982. The jury convicted Louay Francis of one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(a)(3)(B) and (h), and one count of criminal forfeiture in violation of 18 U.S.C. § 982.

■ The district court sentenced Lewis and Louay Francis on November 13, 1996. They filed a motion for a new trial which was denied on January 17, 1997. Lewis Francis filed a timely notice of appeal on January 24; Louay Francis filed his on May 19. As always, we review the denial of a motion for a new trial for an abuse of discretion. *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996).

■ On appeal, Lewis Francis and Louay Francis each raise a series of claims in which they assert that the prosecutor engaged in improper vouching and bolstering, and made inappropriate comments about Lewis's credibility. Whether the various statements amount to prosecutorial misconduct and whether they rendered the trial fundamentally unfair are mixed questions of law and fact and are therefore reviewed de novo. *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993).

■ When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper. *See United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir.1986). If they appear improper, we then look to see if they were flagrant and warrant reversal. *See United States v. Carroll*, 26 F.3d 1380, 1388 (6th Cir.1994). To determine flagrancy, the standard set by this Court is: 1) whether the statements tended

to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused. *United States v. Monus,* 128 F.3d 376, 394 (6th Cir.1997) (citing *United States v. Cobleigh,* 75 F.3d 242, 247 (6th Cir.1996)); *Carroll,* 26 F.3d at 1385 (citing *United States v. Leon,* 534 F.2d 667, 679 (6th Cir.1976)). To reverse a conviction because of an improper non-flagrant statement, a reviewing court must determine that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by failing to admonish the jury. *Monus,* 128 F.3d at 394; *Carroll,* 26 F.3d at 1385–86 (citing *United States v. Bess,* 593 F.2d 749, 757 (6th Cir.1979)).

The Defendants' first contention pertaining to misconduct is that the prosecutor improperly vouched for government witnesses. Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness. *See, e.g., Taylor v. United States,* 985 F.2d 844, 846 (6th Cir. 1993); *United States v. Martinez,* 981 F.2d 867, 871 (6th Cir.1992). Generally, improper vouching involves either blunt comments, *see, e.g., United States v. Kerr,* 981 F.2d 1050, 1053 (9th Cir.1992) (stating that improper vouching occurred when prosecutor asserted own belief in witness's credibility through comments including "I think he [the witness] was candid. I think he is honest."), or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony, *see, e.g., Carroll* 26 F.3d at 1388 (stating that improper vouching occurred when prosecutor argued that the witness testifying under a plea agreement was in jeopardy if the court or government did not find the testimony truthful).

Here the specific vouching allegations stem from the prosecutor's references to the plea agreements of testifying witnesses. We have allowed a prosecutor to refer to the plea agreement of a testifying witness. *See United States v. Renteria,* 106 F.3d 765, 767 (7th Cir.1997). The prosecutor may elicit testimony about its terms, attack the credibility of the witness because of it and even refer to the plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility. *See United States v. Monroe,* 943 F.2d 1007 (9th Cir.1991), *cert. denied,* 503 U.S. 971, 112 S.Ct. 1585, 118 L.Ed.2d 304 (1992).

The potential for impropriety emerges, however, when a prosecutor explains that there is to be a recommendation to the witness's sentencing court whether the terms of the plea agreement have been adhered to. Because that recommendation is dependent upon whether the witness testifies truthfully, it is easy for a prosecutor to imply, either intentionally or inadvertently, that the prosecutor is in a special position to ascertain whether the witness was, in fact, testifying truthfully. *Carroll,* 26 F.3d at 1387. Such implication leads quickly to improper vouching. *See also United States v. Dandy,* 998 F.2d 1344, 1353 (6th Cir.1993).

In the present case, the prosecutor improperly elicited information about and referred in her argument to the plea agreement made between the government and two of its witnesses, Lincoln Williams and Larry Walker. The first improper reference to the plea agreements came during the prosecutor's opening argument when she asserted that " . . . if [Mr. Williams] testifies in this court truthfully, it's my intent to, as a government's representative, to recommend a 15 year sentence for him." She followed this by explaining that Mr. Walker had backed out of his original plea agreement, gone to trial, and been convicted and sentenced, but that she had "told him that [she] will go and inform the judge . . . of his cooperation here, and it rests with the judge . . . as to whether he wants to amend the sentence . . . ." Though she stated that each decision regarding the witnesses' sentences ultimately rested with the sentencing judge, the prosecutor used her opening argument to emphasize the role

she would have in recommending whether the witnesses' sentences should be lowered because of their testimony in the Francis trial. The wording of her argument made it clear that her recommendation would depend on whether she personally believed Mr. Williams and Mr. Walker told the truth. Because this could lead a reasonable juror to infer that the prosecutor had a special ability or extraneous knowledge to assess credibility, the statements were improper.

█ The more troublesome reference to Mr. Williams's plea agreement came during his testimony as the prosecutor examined him. Through a series of questions, the prosecutor elicited information about the initiation of his plea agreement. The jury heard how the prosecutor and Mr. Williams met once and the meeting ended "abruptly" because the prosecutor "said [Mr. Williams] wasn't telling the truth, . . . wasn't protecting people at that time." The jury then heard that the prosecutor and Mr. Williams met again, at which time the prosecutor finally believed him and offered him a plea agreement. Mr. Williams's testimony made it clear to the jury that the plea agreement materialized only after the prosecutor believed him. Because this indicated a belief in the witness's credibility, it was improper as well. It follows that this set of remarks constitutes improper vouching.

█ Also here are the arguments that the prosecutor engaged in improper bolstering. Bolstering and vouching are much alike and go to the heart of a fair trial. Bolstering occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury. *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir.1997). A prosecutor may ask a government agent or other witnesses whether he was able to corroborate what he learned in the course of a criminal investigation. However, if the prosecutor pursues this line of questioning, she must also draw out testimony explaining how the information was corroborated and where it originated. *See United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir.1993).

Here, the prosecutor asked Agent Blackwood repeatedly whether he had corroborated information obtained from Mr. Walker. There were at least fourteen such inquiries. Although Agent Blackwood answered each in the affirmative, he provided further detail in only two instances. He did this by properly adding that he had corroborated what Mr. Walker had told him by checking police reports, bank records, tax records, and interviews and conversations with other individuals. He also testified that he had corroborated the drug dealing by arranging for an undercover officer to purchase drugs. On all other occasions, however, Agent Blackwood responded to questions about corroboration by merely asserting that he had, in fact, corroborated the information. The prosecutor's failure to introduce to the jury whether the information was corroborated via documents, searches, conversations, or other means, would lead a reasonable juror to believe that the prosecutor was implying a guarantee of truthfulness based on facts outside the record. This particular group of comments therefore amounts to improper bolstering.

█ Lewis Francis also raises the prosecutor improperly questioning his credibility. If a defendant testifies as here, a prosecutor may attack his credibility to the same extent as any other witness. *See Raffel v. United States*, 271 U.S. 494, 497, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), *see also Fitzpatrick v. United States*, 178 U.S. 304, 315, 20 S.Ct. 944, 44 L.Ed. 1078 (1900). This Court has held that a prosecutor may assert that a defendant is lying during her closing argument when emphasizing discrepancies between the evidence and that defendant's testimony. *See United States v. Veal*, 23 F.3d 985, 989 (6th Cir.1994). To avoid impropriety, however, such comments must "reflect reasonable inferences from the evidence adduced at trial." *See id.* (quoting *United States v. Goodapple*, 958 F.2d 1402, 1409–10 (7th Cir.1992)). Again, misconduct occurs when a jury could reasonably believe that the prosecutor was, instead, expressing a personal opinion as to the witness's credibility. *Taylor*, 985 F.2d at 846 (citing *United States v. Causey*, 834 F.2d 1277, 1283 (6th Cir.1987), *cert. denied*, 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988)).

The prosecutor called Lewis a liar and con man in her closing argument but without a reference to the evidence produced during the trial. At one point she asserted that "Lewis Francis is the one who's on trial here, and ... when he took the stand he had an obligation to tell you the truth ... but he didn't tell you the truth and you know it based on your everyday experiences and judging the credibility of individuals that you deal with all the time. He lied to you. He lied ...." Later, she added "... if there was a con artist who took the stand during the trial, it wasn't Larry Walker, it was Lewis Francis. I submit to you that the reason he took the stand is he thought that he could charm his way into your hearts and minds and somehow convince you that he's this nice, charming banker who would never ... engage in such activity ...." (references to defense counsel's overruled objection omitted).

Because Lewis took the stand, it was not improper for the prosecutor to question his credibility. The impropriety stems from the manner in which she did so. The prosecutor's attacks were not expressly based on evidence before the jury. *See United States v. Collins,* 78 F.3d 1021, 1040 (6th Cir.1996) (stating that comments that go beyond reasonable inferences from presented evidence delve into the realm of inappropriate expressions). Upon review of the record, we find no analysis of the evidence that supports her attacks. Had she wanted to give examples of discrepancies in Lewis's testimony or between his testimony and other documents, testimony or evidence, and *then* draw the conclusion that he had lied, that would have been allowed. These utterances of personal sentiment placed in front of the jury with no explanation or indication of evidentiary bases were improper.

We now turn to whether all of this amounted to prejudicial error. *United States v. Young,* 470 U.S. 1, 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Upon a showing that comments were improper, a defendant must show that the impropriety was so flagrant that it required reversal because only a retrial could correct the error, *United States v. Blandford,* 33 F.3d 685, 708 n. 23 (6th Cir.1994), which is a pretty high standard. This case does not, however, mirror the typical prosecutorial misconduct cases. Here, each set of remarks that constitutes a type of impropriety, when viewed alone, may not warrant reversal. *See Monus,* 128 F.3d at 394 (addressing each comment or set of comments individually for potential flagrancy). When reviewed individually, only several of the prosecutor's statements are flagrantly improper.[2] Applying these considerations as found in *Leon,* while each of the instances of impropriety may have misled the jury, they were, for the most part, isolated from the other sets of remarks and not deliberate. *See id.* at 679. Accordingly, they were not flagrant. The analysis therefore turns on whether the comments merit non-flagrant reversal according to the considerations laid out in *Bess.* Again, the comments, when viewed individually do not seem to comply with these requirements. Although the district court failed to cure the impropriety by admonishing the jury, defense counsel did not object to all of the improper comments and here the proof of guilt is rather strong.

However, when we review the numerous examples of impropriety in this case together and in the context of the entire trial, a new trial is appropriate. The determination of whether a prosecutor's behavior constituted prejudicial error must be made in the context of the whole trial. *Young,* 470 U.S. at 11, 105 S.Ct. 1038. This must be done because the line between vigorous advocacy and the denial of a fair trial is a fine

**2.** One example is, during her examination of Agent Blackwood, the prosecutor improperly elicited information regarding the guilty pleas of individuals that did not testify at trial. *See United States v. Sanders,* 95 F.3d 449, 454 (6th Cir. 1996). Because the government concedes that this line of questioning violated clearly established rules of law, its impropriety requires no further discussion. Although the government ar-

gues that Blackwood's testimony regarding these plea agreements constitutes harmless error, we disagree. Had there been no other improper prosecutorial statements or questions, the government's argument might have exhibited some merit. In light of the numerous improper statements, however, we find Blackwood's testimony to be emblematic of the prosecutorial impropriety that permeated this trial.

line. Prosecutors face the difficult task of walking this line while playing a dichotomy of roles. They must be zealous advocates and enforcers of the law while, at the same time, acting in a manner that ensures a fair and just trial. *See United States v. Reliford,* 58 F.3d 247, 251 (6th Cir.1995). As the Supreme Court stated in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

> The United States is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape ·or innocence suffer. He may prosecute with earnestness and vigor, indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

The prosecutor here simply failed in her duty to "refrain from improper methods," and did so pervasively and repeatedly, presenting to the jury without substantiated arguments, implicit opinions and conclusory assertions. Although individual review of each remark or of the separate sets of remarks within *Leon* and *Bess* are not as severe, our review of all of the statements throughout the whole trial compels us to remand these cases for new trials.

Judgment reversed.