**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0372n.06

No. 18-2193

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| DERRICK GARRELL SAMUELS, | ) | |
| | ) | **OPINION** |
| **Defendant-Appellant.** | ) | |
| | ) | |

**FILED**
Jul 18, 2019
DEBORAH S. HUNT, Clerk

Before:  MOORE, KETHLEDGE, and MURPHY, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  A jury found Derrick Garrell Samuels guilty of one count of conspiracy to distribute and possess with intent to distribute heroin, three counts of distribution of heroin, and one count of attempted distribution of heroin.  The district court sentenced Samuels to 240 months of incarceration.  Samuels now argues that his trial was tainted by errors, the evidence was insufficient to support a conspiracy charge, and his sentence was unreasonable.  His trial and sentencing were free of the errors he alleges, and we **AFFIRM** the judgment of the district court.

**I.  BACKGROUND**

Samuels spent years dealing heroin in the Upper Peninsula of Michigan.  R. 121 (Trial Tr. Vol. II at 248–49) (Page ID #742–43).  Some of his purchasers re-sold the heroin they bought from him, drove him to Chicago to pick up more heroin, and cleaned his house after it was searched by the police.  *E.g.*, *id.* at 257 (Page ID #751); *id.* at 481 (Page ID #975); *id.* at 271 (Page ID #765).

These co-conspirators testified against Samuels at his trial. All indicated they would assert their Fifth Amendment rights if asked questions about drugs, and so all were given use immunity. *E.g.*, *id.* at 304–05 (Page ID #798–99). The jury found Samuels guilty of all five counts.[1] R. 139 (Judgment at 1) (Page ID #1538). At sentencing, Samuels argued to the district court that, despite the fact that the career offender Guidelines applied to him, he should be sentenced as though they did not because his predicate offenses and offense of conviction were all free of weapons or overt violence and involved relatively small amounts of drugs. R. 143 (Sentencing Tr. at 9) (Page ID #1559). The district court sentenced Samuels to 240 months of incarceration, a below-Guidelines sentence. R. 139 (Judgment at 2) (Page ID #1539). Samuels appeals.

## II. ANALYSIS

### A. Samuels's Sentence Was Reasonable

Samuels begins by challenging the procedural and substantive reasonableness of his below-Guidelines sentence. A district court commits procedural error by "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). An adequate explanation of a sentence should "set forth enough to satisfy the appellate court that [the sentencing judge] has considered the parties' arguments and has a reasoned basis for exercising his own legal

---

[1]One count of conspiracy to distribute and possess with intent to distribute heroin, three counts of distribution of heroin, and one count of attempted distribution of heroin. R. 139 (Judgment at 1) (Page ID #1538).

decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). The district judge need not "give the reasons for rejecting any and all arguments [made] by the parties for alternative sentences," but it must address "particular" and "nonfrivolous" arguments in such a way that shows it "considered the defendant's argument," and it must "explain[] the basis for rejecting it." *United States v. Gapinski*, 561 F.3d 467, 474 (6th Cir. 2009) (quoting *United States v. Lalonde*, 509 F.3d 750, 770 (6th Cir. 2007)).

A sentence is substantively unreasonable if, considering the totality of the circumstances, "the sentence is 'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010). A substantively unreasonable sentence may result if "the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *Id.* at 633 (quoting *United States v. Walls*, 546 F.3d 728, 736 (6th Cir. 2008)). We review challenges to the substantive reasonableness of a sentence for abuse of discretion. *United States v. Taylor*, 800 F.3d 701, 713 (6th Cir. 2015). Within-Guidelines sentences are presumptively reasonable, and defendants who challenge the substantive reasonableness of a below-Guidelines sentence "bear a heavy burden." *United States v. Greco*, 734 F.3d 441, 450 (6th Cir. 2013).

Samuels argues the district court committed two errors that rendered his sentence unreasonable. First, he argues it erred by "not sufficiently considering the 3553(a) [sic] factors and the Appellant's arguments that those factors justified leniency." Appellant Br. at 40. Next, he argues that the district court did "not discuss or address the real rationale behind" a 2016 report

3

of the Sentencing Commission that recommended that offenders with only non-violent drug offenses be excepted from the career-offender sentencing enhancement. *Id.* at 43. Samuels's articulation of the errors he alleges—that the district court did not "sufficiently" consider his argument or "address the real rationale" behind the Sentencing Commission report—reveals the fatal flaw in his claim, and the reason we deny it: the district court did consider the § 3553(a) factors and the 2016 Sentencing Commission report. Not only did it consider Samuels's arguments, but also it gave a below-Guidelines sentence for those very reasons. It did not, however, accept Samuels's arguments in full. That is not an error.

The crux of Samuels's argument, both to the district court and on appeal, is that Samuels is the sort of criminal for whom the application of the career-offender enhancement does not make sense.[2] R. 143 (Sentencing Tr. at 9) (Page ID #1559). Both of Samuels's prior felonies were non-violent drug offenses based on relatively small amounts of drugs. *Id.* None of the evidence at trial suggested overt violence, nor was a gun involved. Samuels is the sort of offender that a 2016 report of the Sentencing Commission suggested should not be subject to the career-criminal enhancement. *See Report to the Congress: Career Offender Sentencing Enhancements*, U.S. Sentencing Comm'n 3 (Aug. 2016),

---

[2]Samuels claims that, in addition to the career-offender argument, the district court failed adequately to address his arguments based on other § 3553(a) factors. Appellant Br. at 36–37. These arguments seem to be similar to, if not duplicative of, the career-offender argument. For example, he argues that his criminal history included prior offenses that were "relatively minor" and non-violent and that his offense behavior involved "no violence or firearms." *Id.* at 36. He points also to his age and the relatively small amounts of drugs involved in each transaction. *Id.* at 36–37. To the extent that Samuels made § 3553(a) arguments distinct from his career-offender argument, the court sufficiently addressed at sentencing all the arguments Samuels presented. R. 143 (Sentencing Tr. at 23–34) (Page ID #1573–84).

https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf.  Samuels presented this argument to the district court.  *E.g.* R. 132 (Mem. in Support of Motion for a Downward Variance at 1–3) (Page ID #1504–06).  The district court, however, did not find the report to be "a terribly persuasive piece of information either way."  R. 143 (Sentencing Tr. at 26) (Page ID #1576).  Rather, it "weigh[ed] and consider[ed] all the facts and circumstances of the case."  *Id.* at 23 (Page ID #1573).  It began with the appropriately calculated Guidelines range of 262 to 327 months[3] and then thoroughly explained its reasons for sentencing Samuels to 240 months of incarceration in a colloquy that ranges over 10 pages of transcript.  *Id.* at 23–34 (Page ID #1573–84).  The district court considered the report and its rationale, and it recognized important mitigating factors:  the fact that "there still are situations involving drug activity that . . . are even more significant and serious" than Samuels's, that Samuels's "pattern of conduct didn't involve the overt violence or use of firearms or other overt coercion," and that 240 months "is still a long time . . . especially for somebody in his forties."  *Id.* at 27 (Page ID #1577).  These mitigating factors were weighed alongside the "duration and consistency" of Samuels's criminal conduct, the likelihood that Samuels resumed dealing drugs "immediately . . . or a short time thereafter" being released from prison, "the fact that there isn't apparently anything else [other than drug dealing] going on in Mr. Samuels' [sic] life by way of constructive employment anyway since age 25," "the sheer number of transactions and the

---

[3]Samuels does not seem to argue that the appropriate Guidelines range would have been 78 to 97 months—the range without the career-offender enhancement—although he does say that "a focus on the Appellant and his conduct meant that the guidelines were 78–97 months."  Reply Br. at 6.  In any event, the district court calculated the Guidelines range correctly, using the applicable career-offender enhancement that exists under current law.

number of people contacted," the quantity of drugs involved was likely underrepresented, and the "serious harm to lots of real people in the community" caused by Samuels's drug dealing. *Id.* at 28–31 (Page ID #1578–81). Finally, the district court said that "if we didn't have the career-offender enhancement in place, I think this is the kind of case where there would be a good reason to depart upward . . . to a higher level, reflecting both what I think is a significant risk of recidivist behavior and to some extent an understatement of the severity of the actual criminal history." *Id.* at 33 (Page ID #1583).

In sum, the district court considered the Sentencing Commission report and all of Samuels's arguments. It considered the other § 3553(a) factors. It gave Samuels a below-Guidelines sentence for precisely the reasons Samuels argues one was warranted: his crimes did not involve "overt violence" and Samuels is over 40 years old. *Id.* at 33–34 (Page ID #1583–84). Nevertheless, the district court determined that a long sentence was warranted in order, among other things, to deter Samuels, who has demonstrated recidivist tendencies. Samuels's sentence was neither procedurally nor substantively unreasonable. Therefore, this claim fails.

## B. There Was Sufficient Evidence for the Jury to Find a Drug Conspiracy Existed

Turning to his trial, Samuels contends that the government failed to present sufficient evidence for a jury to convict him of a conspiracy to distribute and possess with intent to distribute heroin. *See* R. 36 (Superseding Indictment at 1) (Page ID #66); R. 139 (Judgment at 1) (Page ID #1538). We review post-verdict challenges to the sufficiency of the evidence by asking "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979). "[W]e do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Jordan*, 544 F.3d 656, 670 (6th Cir. 2008) (quoting *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001)). To establish a drug conspiracy under 21 U.S.C. § 846, the government must show "an agreement to violate drug laws," "knowledge and intent to join the conspiracy," and "participation in the conspiracy." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009) (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)).

Here, the government presented to the jury evidence that Samuels was in a conspiracy with at least four co-conspirators. The evidence that Samuels knowingly entered into and participated in this conspiracy was plentiful. First, two of his co-conspirators testified that they were acting as re-sellers of his heroin. These witnesses testified that Samuels would "front" them large quantities of heroin, which they would then re-sell and later pay Samuels with the proceeds. *E.g.* R. 121 (Trial Tr. Vol. II at 284) (Page ID #778) (one witness testifying that "[o]nce in a while [Samuels] would front me a large amount [of heroin], a couple grams, and I would have to bring him back a certain amount of money"); *id.* at 473–74 (Page ID #967–68) (another witness testifying that he was re-selling heroin to people and Samuels "probably figured" that). In addition, the co-conspirator witnesses testified about Samuels's security precautions and "paranoi[a]." *Id.* at 321 (Page ID #815). He had security cameras, patted down his co-conspirators to check for wires, changed phone numbers frequently, and would not allow purchasers into his home if he saw someone he thought was suspicious outside. *Id.* at 523–24 (Page ID #1017–18); *id.* at 321–22 (Page ID #815–16); *id.* at 477 (Page ID #971); *id.* at 320 (Page ID #814). This supports the theory

that Samuels was intentionally selling directly to a small number of people to minimize risk and relying on his co-conspirators to re-sell to a wider customer base. Despite Samuels's assertion to the contrary, there was sufficient evidence from which a jury could have concluded that Samuels did know that his co-conspirators were re-selling the heroin. *See* Appellant Br. at 48.

The conspiracy charge does not rely solely on the re-sellers' testimony that Samuels knew about their actions, however. Instead, the government presented affirmative evidence of cooperation between the co-conspirators that demonstrated an agreement in which Samuels knowingly participated. First, a co-conspirator witness testified that she and other co-conspirators helped Samuels clean up his home (out of which he sold heroin) after the police raided it. *Id.* at 271–72 (Page ID #765–66). Next, the government presented testimony from multiple co-conspirators who drove Samuels to Chicago so that he could pick up heroin. Samuels would ask the co-conspirators to drive him to Chicago and then pay them with the heroin he obtained in the city. *Id.* at 259–60 (Page ID #753–54); *id.* at 320–21 (Page ID #814–15); *id.* at 481–82 (Page ID #975–76). These trips are evidence of a drug conspiracy, showing that Samuels and the co-conspirators were in a joint venture.

Samuels argues that the co-conspirators did not know that Samuels was picking up heroin because they never saw him get the drugs in Chicago and therefore this evidence cannot support the existence of the conspiracy. True, the co-conspirators never saw Samuels get the drugs while in Chicago, but there was plentiful evidence to support their unanimous testimony that the trips were for the purpose of obtaining heroin. For example, they frequently did not receive their payment in heroin until after arrival in Chicago, and that heroin was sometimes "unpacked" or in

a different bag than Samuels's usual packaging. *Id.* at 327 (Page ID #821); *id.* at 298 (Page ID #792); *id.* at 483–84 (Page ID #977–78). Sometimes they would drive from the Upper Peninsula to Chicago for "a quick pickup thing." *Id.* at 327 (Page ID #821). Given the circumstances—the distance from the Upper Peninsula to Chicago and the fact that Samuels usually distributed heroin to his co-conspirators only after he got to Chicago—and the co-conspirators' unanimous testimony that the purpose of the trips was to acquire heroin, the jury could have reasonably found that the trips to Chicago were a concerted effort of co-conspirators to acquire drugs.

Samuels argues that his co-conspirators were no more than purchasers and therefore he falls into a purported buyer-seller exception to drug conspiracies. He supports his argument by saying the evidence showed he had "no interest" in what the people to whom he sold did with the heroin as well as his "lack of trust" of his buyers. These facts, however, do not undercut the evidence that Samuels was a knowing participant in a drug conspiracy. "The government need not show that a defendant participated in all aspects of the conspiracy," and each participant in a drug conspiracy need not be an equal partner. *United States v. Odom*, 13 F.3d 949, 959 (6th Cir. 1994). The government presented evidence showing that the witnesses were more than simple customers; they were part of a conspiracy in which Samuels knowingly participated. Samuels's attempts to argue otherwise fail.

## C. There Was No Prosecutorial Misconduct

Next, Samuels argues that he was denied a fair trial because of the manner in which witnesses were immunized and the way the district court and prosecutor explained the immunity grants to the jury. Multiple trial witnesses indicated they intended to assert their Fifth Amendment

right against self-incrimination if asked about drug use. *E.g.*, R. 121 (Trial Tr. Vol. II at 237) (Page ID #731). After each of these witnesses so indicated, the district court entered an order granting the witness use immunity. *E.g.*, *id.* at 237–38 (Page ID #731–32). Each time, the district court explained use immunity to the jury, noting that the witness could still be prosecuted for her crimes based on other evidence and that the witness remained liable for perjury if she were to lie under oath. *E.g.*, *id.* At the close of trial, the district court instructed the jury that "[u]se immunity means the government cannot use the witness's own testimony against that witness in any drug prosecution. The government may, however, prosecute drug charges against a witness if the charges are based on evidence other than that witness's own testimony. The government may also prosecute the witness for perjury." R. 122 (Trial Tr. Vol. III at 907) (Page ID #1401). These instructions were based on the Sixth Circuit Model Instructions. *See* Reply Br. at 14 n.4.

Samuels argues that the manner in which these witnesses were immunized, and specifically the multiple mentions that they remained liable for perjury, constituted prejudicial prosecutorial misconduct or otherwise caused his trial to be unfair. Samuels's allegations of misconduct contain two potential errors: improper vouching and bolstering. "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness." *United States v. Trujillo*, 376 F.3d 593, 607 (6th Cir. 2004) (quoting *United States v. Martinez*, 253 F.3d 251, 253–54 (6th Cir. 2001)). "Bolstering occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known

to the jury." *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999). Both errors "go to the heart of a fair trial." *Id.* Neither occurred here.

The immunity process, instructions to the jury, and accompanying mentions of perjury liability were neither vouching nor bolstering. As to vouching, neither the prosecutor nor the district court indicated a personal belief in a witness's credibility. The district court's role in the immunization process was objective and informative. The prosecutor did argue that the witnesses were credible, but he is allowed to do so within appropriate bounds, just as the defense was allowed to argue they lied. *See United States v. Henry*, 545 F.3d 367, 379–80 (6th Cir. 2008). In fact, the defense argued during closing arguments that the grants of immunity meant that the government's witnesses were not credible. R. 122 (Trial Tr. Vol. III at 939) (Page ID #1433) ("The government's witnesses. Let's talk about them. We saw convicted criminals. We saw drug addicts. Informants. All of whom were given immunity."); *id.* at 953 (Page ID #1447) ("The informants all had a strong motive to lie. They all had to keep their deals. They all had to stay out of jail. . . . The immunity given to the witnesses. What witness has to come to court only under a promise of immunity? Who does that? Lying people do that."). The prosecutor pointed out that the immunity was limited, but never suggested the jury should believe the witnesses because he, personally, did. The prosecutor merely reiterated the district court's jury instruction with no mention of perjury: "Immunity. You heard the Court's order. Remember what the Court said to these people? He said, '. . . [Y]ou have a Fifth Amendment right. You are compelled to testify, and as a result I'm going to tell the government that they can't use your words against you.' That's not blanket immunity." *Id.* at 956–57 (Page ID #1450–51). This is a far cry from *United States v. Carroll*,

26 F.3d 1380 (6th Cir. 1994), in which "the prosecutor blatantly implied that the [witnesses'] plea agreements ensured that the witnesses were truthful" and "placed the prestige of the government, and even of the court, behind the credibility of the [witnesses], by stating that, if the government or the judge did not believe that the witnesses were being truthful, the witnesses would be in jeopardy." *Carroll*, 26 F.3d at 1389.

The bolstering claim here is similarly without merit. In *Francis*, the prosecution asked an agent fourteen times whether he had corroborated a witness's information, and only twice in response did the agent provide details of how the information was corroborated. 170 F.3d at 551. The remaining twelve times, the agent merely answered in the affirmative, which "would lead a reasonable juror to believe that the prosecutor was implying a guarantee of truthfulness based on facts outside the record." *Id.* There was no analogous behavior here. The only statement of the prosecutor to which Samuels points came after the first witness, who asserted her Fifth Amendment right, was immunized. The district court explained immunity to the jury and mentioned that use immunity did not protect the witness from perjury charges. R. 121 (Trial Tr. Vol. II at 237–38) (Page ID #731–32). The prosecutor then stated, "I think the order also says she's not protected from a perjury charge." *Id.* at 238 (Page ID #732). The district court responded: "Right. I thought I had said that in describing it. If I didn't, I meant to." *Id.* at 239 (Page ID #733). Samuels argues that this was improper emphasis by the prosecution on the witness's perjury liability. That is not the case; rather, the prosecutor's passing comment clearly was the result of a failure to hear or register the district court's mention of perjury and did not draw improper attention to the witness's perjury liability.

Samuels's final argument is that cases such as *Carroll* and *Francis* are inapposite because they deal with witnesses who had plea agreements rather than immunity. He argues that a witness who receives a plea agreement has a stronger incentive to lie than one who receives use immunity, and therefore more emphasis on perjury liability is appropriate than would be in cases such as his, where the witnesses received no benefit in exchange for their testimony. This argument fails for at least two reasons. First, Samuels argued throughout the trial that at least some of the witnesses were receiving a benefit in exchange for their testimony: they had federal charges dropped and replaced with state charges that resulted in far less jail time. *E.g.*, *id.* at 151–54 (Page ID #645–48). Next, the distinction makes no difference. An immunity grant could lead a jury to believe that a witness is being offered something in exchange for his or her testimony, implying that witness was more likely to lie. This should not come as a surprise to Samuels, whose trial counsel made this very argument during closing. As a result, the prosecution is entitled to rebut that inference in a reasonable, factual manner that avoids vouching or bolstering. Here, the prosecution said no more than it was entitled to, and Samuels's claim therefore fails.

## D. There Was No *Enright* Error

Finally, Samuels argues that the district court erred by failing to make *Enright* findings regarding "numerous statements made by the Appellant [that] were conditionally admitted." Appellant Br. at 57. There were no objections at trial, and so we review this claim for plain error. *United States v. Benson*, 591 F.3d 491, 501 (6th Cir. 2010).

The term "*Enright* findings" refers to *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978), which established a test for admitting a co-conspirator's out-of-court statement. Rule

13

801(d)(2)(E) of the Federal Rules of Evidence provides that a statement is not hearsay if it is offered against a party and is the statement of a co-conspirator made "during and in furtherance of the conspiracy." If one of the conditions for admission under Rule 801(d)(2)(E) is not yet supported by evidence—for example, if it is not yet established that the person who made the statement was a co-conspirator—the court may conditionally admit the statement. FED. R. EVID. 104(b). The district court must at some later point make the *Enright* finding: "(1) that the conspiracy existed; (2) that the defendant was a member of the conspiracy; and (3) that the co-conspirator's statements were made in furtherance of the conspiracy." *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999).

In this case, at the start of trial, the district court explained its usual process for dealing with co-conspirator hearsay statements:

> [M]y normal practice is to allow what the government thinks is a coconspirator statement, subject, of course, to final Enright findings at the end of the case. So if you want—the defense want[s] to object, that's fine, if you think a statement comes in, but my response will likely be, you know, I'll admit it subject to my final determinations on the Enright factors at the end of the proofs.

R. 120 (Trial Tr. Vol. I at 9) (Page ID #503). This was the sole mention of *Enright* at the trial, as far as we can discern.[4]

Samuels is correct that the district court never made *Enright* findings, but that was not an error. It never made *Enright* findings for a simple reason: as far as we can tell, not one co-

---

[4]Samuels does not cite any statements made at trial in his opening brief. Nor does he cite any statements in his reply brief, despite the government having pointed out this failure in its response.

conspirator hearsay statement was conditionally admitted over defense objection.[5] Nor did the defense mention a failure to make *Enright* findings at the close of the government's case. *See* R. 122 (Trial Tr. Vol. III at 819–21) (Page ID #1313–15) (defense moving for a directed verdict at the close of government proofs). If there was a co-conspirator hearsay statement admitted at trial that so blatantly required *Enright* findings that the failure to do so constituted plain error even in the absence of all defense objection, we have no way of identifying it. Samuels does not identify any specific statements as co-conspirator hearsay in either his principal or reply brief. He says only that "numerous statements . . . were conditionally admitted." Appellant Br. at 57. Despite the government pointing out this error in its response brief, Samuels does not identify any specific statement in his reply brief. Rather, he merely says that the testimony, which he summarized in his facts section, "included numerous hearsay statements that are only admissible if they are co-conspirator statements." Reply Br. at 20. This is plainly deficient. Rule 28(a)(8)(A) of the Federal Rules of Appellate Procedure requires the argument section of a brief to contain "citations to the authorities and parts of the record on which the appellant relies." We therefore find this argument forfeited. *See United States v. Young*, 847 F.3d 328, 342 (6th Cir. 2017).

Moreover, Samuels's claim fails because it appears that he is arguing *his* statements required *Enright* findings in order to be admitted. *See* Appellant Br. at 57 ("[N]umerous statements made by the Appellant were conditionally admitted."). In other words, he is contesting not the admission of a co-conspirator's statements, but rather his own. Any such statement would be

---

[5]The defense objected once to a co-conspirator statement as "all in the realm of hearsay." R. 121 (Trial Tr. Vol. II at 324) (Page ID #818). The district court sustained that objection. *Id.*

admissible under Rule 801(d)(2)(A) of the Federal Rules of Evidence, and the existence of a conspiracy would be immaterial.  Therefore this claim fails.

### III.  CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment.